UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SUSAN AGOSTINO, LISA BUCHANAN　　　:
and JEFFREY S. EUBANKS,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-against-　　　　　　　　　　　　:

OUTBACK STEAKHOUSE OF FLORIDA, :
INC. and OUTBACK STEAKHOUSE-NYC,:
LTD.,　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
OUTBACK STEAKHOUSE OF FLORIDA, :
INC. and OUTBACK STEAKHOUSE-NYC :
LTD.,　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants/　　　　　　　　:
　　　　　　　　　　Third Party Plaintiffs,　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-against-　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
SMITH FOODS LLC, SMITH FOODS,　　　　:
CORP., FORREST SMITH, and　　　　　　　:
KIMBERLY SMITH,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Third Party　　　　　　　　:
　　　　　　　　　　Defendants　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------X

Docket No.06-CV-1322(CPS)(CLP)

**ANSWER, AFFIRMATIVE DEFENSES
AND THIRD PARTY COMPLAINT**

　　　　Defendants, Outback Steakhouse of Florida, Inc. and Outback Steakhouse-NYC, Ltd.,

(hereinafter referred to as "Defendants") by way of Answer to Plaintiffs' Susan Agostino, Lisa

Buchanan and Jeffrey S. Eubanks (hereinafter sometimes collectively referred to as "Plaintiffs")Complaint herein say:

### AS TO THE FIRST CAUSE OF ACTION

1.      As to the allegations contained in paragraph 1 of the Complaint, Defendants deny that they were plaintiff Susan Agostino's (hereinafter referred to as "Agostino") Employer at all times relevant this to this action.   Answering further, Defendants neither admit nor deny the remaining allegations in this paragraph as said allegations constitute conclusions of law as to which no response is required and therefore Defendants leave plaintiffs to their proofs.

2.      As to the allegations contained in paragraph 2 of the Complaint, Defendants deny that they were plaintiff Lisa Buchanan's (hereinafter referred to as "Buchanan") Employer at all times relevant this to this action.   Answering further, Defendants neither admit nor deny the remaining allegations in this paragraph as said allegations constitute conclusions of law as to which no response is required and therefore Defendants leave plaintiffs to their proofs.

3.      As to the allegations contained in paragraph 3 of the Complaint, Defendants deny that they were plaintiff Jeffrey S. Eubanks' (hereinafter referred to as "Eubanks") Employer at all times relevant this to this action.   Answering further, Defendants neither admit nor deny the remaining allegations in this paragraph as said allegations constitute conclusions of law as to which no response is required and therefore Defendants leave plaintiffs to their proofs.

4.      As to the allegations contained in paragraph 4 of the Complaint, Defendants deny that they were plaintiffs' employer at all times relevant this to this action.  Answering further, Defendants neither admit nor deny the remaining allegations in this paragraph as said allegations constitute

conclusions of law as to which no response is required and therefore Defendants leave plaintiffs to their proofs.

5.     As to the allegations contained in paragraph 5 of the Complaint, Defendants deny that Agostino complained about harassment to management, was told to tolerate it and continue accepting the abuse.  Except as so stated, Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore leave plaintiffs' to their proofs.

6.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

7.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

8.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

9.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

11.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

13.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

15.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

16.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

17.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

18.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

19.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

20.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

24.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

24A.    Deny the allegations contained in paragraph 24A of the Complaint.

25.    Deny the allegations contained in paragraph 25 of the Complaint.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

28.    Deny the allegations contained in paragraph 28 of the Complaint.

29.    Deny the allegations contained in paragraph 29 of the Complaint.

30.    As to the allegations contained in paragraph 30 of the Complaint, Defendants admit that a meeting with the personnel identified in this paragraph did occur.  Except as so stated, Defendants deny the remaining allegations in this paragraph.

31.    Deny the allegations contained in paragraph 31 of the Complaint.

32.    Deny the allegations contained in paragraph 32 of the Complaint.

33.    Deny the allegations contained in paragraph 33 of the Complaint.

34.    Deny the allegations contained in paragraph 34 of the Complaint.

## AS TO THE SECOND CAUSE OF ACTION

35.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 34 of the Complaint as if fully set forth herein.

36.     Deny the allegations contained in paragraph 35 of the Complaint.

## AS TO THE THIRD CAUSE OF ACTION

37.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 36 of the Complaint as if fully set forth herein.

38.     As to the allegations contained in paragraph 38 of the Complaint, Defendants deny knowledge or information sufficient to form a belief as to the truth of Agostino's claim that Mr. Noel and Mr. Shavanson touched her and therefore leave Defendants to their proofs.

39.     Deny the allegations contained in paragraph 39 of the Complaint.

40.     Deny the allegations contained in paragraph 40 of the Complaint.

41.     Deny the allegations contained in paragraph 41 of the Complaint.

## AS TO THE FOURTH CAUSE OF ACTION

42.     Defendant repeat and reallege their responses to the allegations contained in paragraphs 1 through 41 of the Complaint as if fully set forth herein.

43.     As to the allegations contained in paragraph 43 of the Complaint, Defendants admit that Agostino advised Defendants that she was pregnant but can neither admit nor deny whether she was, in fact pregnant.

492632.1

44. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

45. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

46. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

47. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

48. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

49. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 49 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

50. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

492632.1

51A.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51A of the Complaint and therefore Defendants leave plaintiffs to their proofs.

51.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

52.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

53.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

54.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

55.    Deny the allegations contained in paragraph 55 of the Complaint.

56.    Deny the allegations contained in paragraph 56 of the Complaint.

57.    Deny the allegations contained in paragraph 57 of the Complaint.

## AS TO THE FIFTH CAUSE OF ACTION

58.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 57 of the Complaint as if fully set forth herein.

492632.1

59.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

60.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

61.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

61A.    Deny the allegations contained in paragraph 61A of the Complaint.

62.     Deny the allegations contained in paragraph 62 of the Complaint.

63.     Deny the allegations contained in paragraph 63 of the Complaint.

## AS TO THE SIXTH CAUSE OF ACTION

64.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 63 of the Complaint as if fully set forth herein.

65.     Deny the allegations contained in paragraph 65 of the Complaint.

65A.    Deny the allegations contained in paragraph 65A of the Complaint.

65B.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65B of the Complaint and therefore Defendants leave plaintiffs to their proofs.

66.     Deny the allegations contained in paragraph 66 of the Complaint.

67.    Deny the allegations contained in paragraph 67 of the Complaint.

## AS TO THE SEVENTH CAUSE OF ACTION

68.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 67 of the Complaint as if fully set forth herein.

69.    Deny the allegations contained in paragraph 69 of the Complaint.

70.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

71.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

72.    Deny the allegations contained in paragraph 72 of the Complaint.

73.    Deny the allegations contained in paragraph 73 of the Complaint.

## AS TO THE EIGHTH CAUSE OF ACTION

74.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.    Deny the allegations contained in paragraph 75 of the Complaint.

76.    Deny the allegations contained in paragraph 76 of the Complaint.

## AS TO THE NINTH CAUSE OF ACTION

77.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 76 of the Complaint as if fully set forth herein.

492632.1

78.     Deny the allegations contained in paragraph 78 of the Complaint.

## AS TO THE TENTH CAUSE OF ACTION

79.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80.     Deny the allegations contained in paragraph 80 of the Complaint.

81.     Deny the allegations contained in paragraph 81 of the Complaint.

## AS TO THE ELEVENTH CAUSE OF ACTION

82.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

83.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

84.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 84 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

85.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 85 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

85A.   Deny the allegations contained in paragraph 85A of the Complaint.

86.     Deny the allegations contained in paragraph 86 of the Complaint.

## AS TO THE TWELFTH CAUSE OF ACTION

87.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

88.     Deny the allegations contained in paragraph 88 of the Complaint.

89.     Deny the allegations contained in paragraph 89 of the Complaint.

90.     Deny the allegations contained in paragraph 90 of the Complaint.

## AS TO THE THIRTEENTH CAUSE OF ACTION

91.     Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 90 of the Complaint as if fully set forth herein.

92.     Deny the allegations contained in paragraph 92 of the Complaint.

93.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 93 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

94.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 94 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

95.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 95 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

96.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 96 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

97.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

98.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

99.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

100.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 100 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

101.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

102.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 102 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

103.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

104.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

105.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

106.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 106 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

107.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 107 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

108.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 108 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

109.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 109 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

110.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 110 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

111.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 111 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

112.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 112 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

113.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 113 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

114.    Deny the allegations contained in paragraph 114 of the Complaint.

115.    Deny the allegations contained in paragraph 115 of the Complaint.

116.    Deny the allegations contained in paragraph 116 of the Complaint.

117.    Deny the allegations contained in paragraph 117 of the Complaint.

### AS TO THE FOURTEENTH CAUSE OF ACTION

118.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

119.    Deny the allegations contained in paragraph 119 of the Complaint.

492632.1

## AS TO THE FIFTEENTH CAUSE OF ACTION

120.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 119 of the Complaint as if fully set forth herein.

121.    Deny the allegations contained in paragraph 121 of the Complaint.

122.    Deny the allegations contained in paragraph 122 of the Complaint.

123.    Deny the allegations contained in paragraph 123 of the Complaint.

124.    Deny the allegations contained in paragraph 124 of the Complaint.

## AS TO THE SIXTEENTH CAUSE OF ACTION

125.    Defendants repeat and reallege their responses to the allegations contained in paragraphs 1 through 124 of the Complaint as if fully set forth herein.

126.    As to the allegations contained in paragraph 126 of the Complaint, Defendants admit, upon information and belief, that plaintiff Buchanan has identified herself as an African-American. Except as so stated, Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore Defendants leave plaintiffs to their proofs.

127.    Deny the allegations contained in paragraph 127 of the Complaint.

128.    Deny the allegations contained in paragraph 128 of the Complaint.

129.    Deny the allegations contained in paragraph 129 of the Complaint.

130.    Deny the allegations contained in paragraph 130 of the Complaint

492632.1

## AS TO THE SEVENTEENTH CAUSE OF ACTION

131.    Defendants repeat and reallege their responses to paragraphs 1 through 130 of the Complaint as if fully set forth herein.

132.    Deny the allegations contained in paragraph 132 of the Compliant.

133.    Deny the allegations contained in paragraph 133 of the Complaint.

134.    Deny the allegations contained in paragraph 134 of the Complaint.

## AS TO THE EIGHTEENTH CAUSE OF ACTION

135.    Defendants repeat and reallege their responses to paragraphs 1 through 134 of the Complaint as if fully set forth herein.

136.    Deny the allegations contained in paragraph 136 of the Complaint.

137.    Deny the allegations contained in paragraph 137 of the Complaint.

## AS TO THE NINETEENTH CAUSE OF ACTION

138.    Defendants repeat and reallege their responses to paragraphs 1 through 137 of the Complaint as if fully set forth herein.

139.    Deny the allegations contained in paragraph 139 of the Complaint.

## AS TO THE TWENTIETH CAUSE OF ACTION

140.    Defendants repeat and reallege their responses to paragraphs 1 through 139 of the Complaint as if fully set forth herein.

140A.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 140A of the Complaint and therefore Defendants leave plaintiffs to their proofs.

492632.1

140B.  Deny the allegations contained in paragraph 140B of the Complaint.

140C.  Deny the allegations contained in paragraph 140C of the Complaint.

### AS TO THE TWENTY-FIRST CAUSE OF ACTION

141.  Defendants repeat and reallege their responses to paragraphs 1 through 140C of the Complaint as if fully set forth herein.

142.  Deny the allegations contained in paragraph 142 of the Complaint.

143.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 143 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

144.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 144 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

145.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 145 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

146.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 146 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

147.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 147 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

492632.1

148.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 148 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

149.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 149 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

150.    As to the allegations contained in paragraph 150 of the Complaint, Defendants admit, upon information and belief, that Mr. Shavenson showed nude pictures of himself to Eubanks.  Except as so stated, Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 150 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

151.    Defendants neither admit nor deny paragraph 151 of the Complaint as said paragraph has been omitted.

152.    Deny the allegations contained in paragraph 152 of the Complaint.

153.    Deny the allegations contained in paragraph 153 of the Complaint.

154.    Deny the allegations contained in paragraph 154 of the Complaint.

155.    As to the allegations contained in paragraph 155, Defendants admit that Eubanks transferred to an Outback restaurant in Illinois in or about February 2004.  Except as so stated, Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 155 of the Complaint and therefore leave plaintiffs to their proofs.

492632.1

156.    As to the allegations contained in paragraph 156 of the Complaint, Defendants deny knowledge or information sufficient to form a belief as to the allegations as to how "things at first went" at the Outback in Illinois or that Eubanks started receiving "worse treatment shortly after he started working there." Except as so stated, Defendants deny the remaining allegations in paragraph 156 of the Complaint.

157.    Deny the allegations contained in paragraph 157 of the Complaint.

158.    Deny the allegations contained in paragraph 158 of the Complaint.

159.    As to the allegations contained in paragraph 159 of the Complaint, Defendants deny knowledge or information sufficient to form a belief as to the allegations pertaining to the reasons why Eubanks left his employment at Outback and therefore Defendants leave plaintiffs to their proofs. Except as so stated, Defendants admit the remaining allegations in paragraph 156 of the Complaint.

160.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 160 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

161.    Deny the allegations contained in paragraph 161 of the Complaint.

162.    Deny the allegations contained in paragraph 162 of the Complaint.

163.    Deny the allegations contained in paragraph 163 of the Complaint.

164.    Deny the allegations contained in paragraph 164 of the Complaint.

165.    Deny the allegations contained in paragraph 165 of the Complaint.

## AS TO THE TWENTY-SECOND CAUSE OF ACTION

166.    Defendants repeat and reallege their responses to paragraphs 1 through 165 of the Complaint as if fully set forth herein.

167.    Deny the allegations contained in paragraph 167 of the Complaint.

## AS TO THE TWENTY-THIRD CAUSE OF ACTION

168.    Defendants repeat and reallege their responses to paragraphs 1 through 167 of the Complaint as if fully set forth herein.

169.    Deny the allegations contained in paragraph 169 of the Complaint.

170.    Deny the allegations contained in paragraph 170 of the Complaint.

171.    Defendants neither admit nor deny paragraph 171 of the Complaint as said paragraph has been omitted.

172.    Deny the allegations contained in paragraph 172 of the Complaint.

173.    Deny the allegations contained in paragraph 173 of the Complaint.

174.    Defendants neither admit nor deny paragraph 174 of the Complaint as said paragraph has been omitted.

## AS TO THE TWENTY-FOURTH CAUSE OF ACTION

175.    Defendants repeat and reallege their responses to paragraphs 1 through 174 of the Complaint as if fully set forth herein.

176.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 176 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

492632.1

177.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 177 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

178.   Deny the allegations contained in paragraph 178 of the Complaint.

179.   Deny the allegations contained in paragraph 179 of the Complaint.

180.   Deny the allegations contained in paragraph 180 of the Complaint.

## AS TO THE TWENTY-FIFTH CAUSE OF ACTION

181.   Defendants repeat and reallege their responses to paragraphs 1 through 180 of the Complaint as if fully set forth herein.

182.   Deny the allegations contained in paragraph 182 of the Complaint.

183.   Deny the allegations contained in paragraph 183 of the Complaint.

184.   Deny the allegations contained in paragraph 184 of the Complaint.

185.   Deny the allegations contained in paragraph 185 of the Complaint.

186.   Deny the allegations contained in paragraph 186 of the Complaint.

## AS TO THE TWENTY-SIXTH CAUSE OF ACTION

187.   Defendants repeat and reallege their responses to paragraphs 1 through 186 of the Complaint as if fully set forth herein.

188.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 188 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

189.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 189 of the Complaint and therefore Defendants leave plaintiffs to their proofs.

190.    Deny the allegations contained in paragraph 190 of the Complaint.

191.    Deny the allegations contained in paragraph 191 of the Complaint.

Defendants deny that plaintiffs are entitled to the relief contained in the WHEREFORE clauses of the Complaint, paragraphs 1 through 26.

### FIRST SEPARATE DEFENSE

Plaintiffs' Complaint fails to state a claim upon which relief can be granted against Defendants.

### SECOND SEPARATE DEFENSE

The causes of action set forth in Plaintiffs' Complaint are barred in whole or in part by the applicable statute of limitations.

### THIRD SEPARATE DEFENSE

Any and all actions taken by Defendants with respect to Plaintiffs were based upon legitimate business factors and Plaintiffs were treated in a non-discriminatory manner at all times.

### FOURTH SEPARATE DEFENSE

Plaintiffs' claims are barred by the Doctrine of Estoppel.

### FIFTH SEPARATE DEFENSE

Plaintiffs' claims are barred by the Doctrine of Waiver.

### SIXTH SEPARATE DEFENSE

Plaintiffs' claims are barred by the Doctrine of Laches.

492632.1

## SEVENTH SEPARATE DEFENSE

Defendants are not liable for any actions that may have arisen while the plaintiffs worked for a franchisee.

## EIGHTH SEPARATE DEFENSE

Plaintiffs failed to mitigate their alleged damages.

## NINTH SEPARATE DEFENSE

If it is found, contrary to Defendants' assertions herein, that Defendants applied different standards of compensation and different terms or conditions of employment with respect to plaintiffs as alleged in plaintiffs' Complaint, Defendants allege that any such action on their part was lawful, not discriminatory, and based upon good cause, competence, performance, conduct and other reasonable factors, including business necessity.

## TENTH SEPARATE DEFENSE

Defendants did not breach any duty or obligation of any kind whether arising from common law, statute, contract, tort or otherwise.

## ELEVENTH SEPARATE DEFENSE

Defendants exercised reasonable care to prevent and correct promptly any discriminatory conduct in the workplace.

## TWELFTH SEPARATE DEFENSE

Defendants have engaged in prompt and appropriate investigatory activity and proper remedial action in response to any allegations regarding discriminatory conduct in their workplace.

492632.1

### THIRTEENTH SEPARATE DEFENSE

Plaintiffs' claims are barred by their failure to advise and inform Defendants of the alleged wrongful conduct consistent with the Discrimination and Harassment Policy, established by Defendants that was in effect during plaintiffs' employment.

### FOURTEENTH SEPARATE DEFENSE

Plaintiffs' claims are barred by their failure to avail themselves of the remedies provided by the Discrimination and Harassment Policy, established by Defendants that was in effect during plaintiffs' employment.

### FIFTEENTH SEPARATE DEFENSE

Plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities by Defendants or to otherwise avoid harm.

### SIXTEENTH SEPARATE DEFENSE

To the extent plaintiffs seek to assert any claims under state law for lost benefits, such claims are preempted by the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq.

### SEVENTEENTH SEPARATE DEFENSE

To the extent that plaintiffs seek benefits that arise under ERISA, plaintiffs' claims are barred by virtue of plaintiffs' failure to exhaust administrative remedies as provided for by ERISA.

### EIGHTEENTH SEPARATE DEFENSE

Plaintiffs were not participants or beneficiaries of any employee benefit plan of Defendants that would entitle them to benefits.

### NINETEENTH SEPARATE DEFENSE

Plaintiffs are not entitled to recover punitive damages or extra-contractual damages for certain of the claims asserted in plaintiffs' Complaint, particularly since Defendants did not engage in any discriminatory practice with malice or reckless indifference to Plaintiffs' rights.

### TWENTIETH SEPARATE DEFENSE

Certain of plaintiffs' claims may be barred by the exclusivity of any applicable Workers' Compensation laws.

### TWENTY-FIRST SEPARATE DEFENSE

Plaintiffs did not suffer any loss or damage by reason of any alleged acts of Defendants.

### TWENTY-SECOND SEPARATE DEFENSE

Plaintiffs' claims for punitive damages are barred by the due process clause of the Fourteenth Amendment to the United States Constitution.

### TWENTY-THIRD SEPARATE DEFENSE

Some or all of Plaintiffs' claims may be barred by the fact that a statutory remedy exists.

**WHEREFORE,** Defendants pray that this Honorable Court:

1.      Dismiss Plaintiffs' Complaint against Defendants with prejudice;

2.      Declare that Defendants are not obligated to pay compensatory or punitive damages to plaintiffs for any amounts related to the alleged acts asserted in plaintiffs' Amended Complaint;

3.      Declare as improper any demand by plaintiffs for costs, attorneys' fees and other relief; and

4.      Grant such other and further relief as is just and appropriate under the circumstances.

492632.1

## DEMAND FOR TRIAL BY JURY

Defendants demand trial by jury on all issues.

## THIRD PARTY COMPLAINT

1.   At all times material hereto, and continuing to the present, Defendant/Third Party Plaintiff Outback Steakhouse of Florida, Inc., is a corporation organized and existing under the laws of the State of Florida with a principal place of business in Florida.

2.   At all times material hereto, and continuing to the present, Defendant/Third Party Plaintiff Outback Steakhouse-NYC, Ltd. Is a Florida Limited Partnership with a principal place of business in Florida.

3.   Upon information and belief, on or about July 26, 1999, Third Party Defendant Smith Foods, LLC., entered into an Outback Steakhouse Restaurant Franchise Agreement with Defendants/Third Party Plaintiffs pertaining to the Outback Steakhouse Restaurant located at 23-48 Bell Boulevard, Bayside, New York 11360("Outback Bayside Restaurant").

4.   Upon information and belief, Third Party Defendants Forrest Smith and Kimberly Smith were the Operating Partners of the Outback Bayside Restaurant.

5.   Upon information and belief, Defendants/Third Party Plaintiffs and Third Party Defendants Smith Foods LLC, Smith Food Corp., Forrest Smith and Kimberly Smith, entered into an Asset Purchase Agreement ("Agreement") with reference to the Outback Bayside Restaurant.  A copy of that Agreement is annexed hereto as **Exhibit A**

492632.1

6.    Pursuant to Paragraph 3.1 of the Agreement Defendants/Third Party Plaintiffs did not agree to assume the liability for Third Party Defendants with reference to any "Insured Claims" (Section 3.1(b)), "Litigation Matters" whether or not disclosed (Section 3.1(c)), and Third Party Defendants' "Violations of Laws or Orders" (Section 3.1(h)).

7.    Pursuant to Paragraph 4.11(a), Third Party Defendants warranted and represented that they were "in material compliance with all applicable Laws and Orders, including, without limitation, those applicable to discrimination in employment."

8.    Pursuant to Paragraph 10.1 of the Agreement, Third Party Defendants agreed, jointly and severally, to indemnify, defendant and hold harmless Defendants/Third Party Plaintiffs for any claims asserted against Third Party Defendants for which Defendants/Third Party Plaintiffs did not specifically assume up until the date of closing.

9.    As a direct and proximate result of Third Party Defendants conduct, Defendants/Third Party Plaintiffs have suffered and will continue to suffer damages.

## COUNT ONE

### INDEMNIFICATION

1.    Defendants/Third Party Plaintiffs deny any and all legal liability and responsibility for the acts alleged in the complaint.

492632.1

2.     If Defendants/Third Party Plaintiffs should be found liable to plaintiffs herein, which liability is denied, said liability will at least in part be only be secondary, passive, technical, vicarious, or imputed and the liability of Third Party Plaintiffs, herein is primary, active and direct.

3.     Pursuant to Paragraph 10.1 of the Agreement, Third Party Defendants are obligated, jointly and severally, to indemnify, defend and hold harmless Defendants/Third Party Plaintiffs as to the claims raised by plaintiff in their Complaint up until the date of closing.

WHEREFORE, Outback Steakhouse of Florida, Inc. and Outback Steakhouse-NYC, Ltd. demand judgment against Third Party Plaintiffs, Smith Foods LLC, Smith Food Corp., Forrest Smith and Kimberly Smith for any of the claims raised by plaintiffs herein through the date of closing and for their counsel fees and costs in having to defend this matter on behalf of Third Party Defendants.

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**
**Attorneys for Defendants Outback Steakhouse of Florida, Inc. and Outback**
**Steakhouse-NYC, Ltd.**

By: _____
     Seth Ptasiewicz, Esq. (SP8875)

Dated: Newark, New Jersey
       May 1, 2006

492632.1

## CERTIFICATE OF SERVICE

I hereby certify that on behalf of the defendant, I caused the Answer and Third Party Complaint

to be electronically served and filed on this date with:

Clerk, United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Bernard Weinreb, Esq.
2 Executive Blvd. Suite 201
Suffern, New York 10901
Attorneys for Plaintiffs

I further certify that the foregoing statements made by me are true.  I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
Attorneys for Defendants Outback Steakhouse of Florida, Inc. and Outback
Steakhouse-NYC, LTD

By: _____
            Seth Ptasiewicz, Esq. (SP 8875)

Dated: Newark, New Jersey
            May 1, 2006

492632.1

# EXHIBIT A

FORM OF

ASSET PURCHASE AGREEMENT

TO BE ENTERED INTO BY AND BETWEEN

AFFILIATE OF OUTBACK STEAKHOUSE OF FLORIDA, INC.

AND

FORREST SMITH, KIMBERLY SMITH, SMITH FOODS CORP. AND SMITH FOODS LLC

Dated as of March 5, 2003

## ASSET PURCHASE AGREEMENT

**TABLE OF CONTENTS**

1. PURCHASE OF THE RESTAURANTS ........................................................................... 1
   1.1 Purchase of the Restaurants ........................................................................... 1
   1.2 Purchase Price ................................................................................................ 1
   1.3 Adjustment to Purchase Price ........................................................................ 2
   1.4 Allocation of Purchase Price .......................................................................... 2

2. TRANSFER OF ASSETS ............................................................................................ 2
   2.1 Definition of Purchased Assets ...................................................................... 2
   2.2 Prorations ...................................................................................................... 3
   2.3 Excluded Assets ............................................................................................. 4

3. LIABILITIES ................................................................................................................ 4
   3.1 Liabilities Not to be Assumed ....................................................................... 4
   3.2 Liabilities to be Assumed .............................................................................. 5

4. REPRESENTATIONS AND WARRANTIES OF THE SELLER, SFC FORREST SMITH
   AND KIMBERLY SMITH ........................................................................................... 6
   4.1 General ........................................................................................................... 6
   4.2 Authority ........................................................................................................ 6
   4.3 No Violation ................................................................................................... 6
   4.4 Financial Statements ...................................................................................... 7
   4.5 Tax Matters .................................................................................................... 7
   4.6 Accounts Receivable ...................................................................................... 7
   4.7 Inventory ........................................................................................................ 7
   4.8 Absence of Certain Changes .......................................................................... 7
   4.9 Absence of Undisclosed Liabilities ............................................................... 8
   4.10 No Litigation .................................................................................................. 8
   4.11 Compliance With Laws and Orders ............................................................... 8
   4.12 Title to and Condition of Properties .............................................................. 9
   4.13 Insurance ........................................................................................................ 10
   4.14 Contracts and Commitments .......................................................................... 10
   4.15 Labor Matters ................................................................................................ 11
   4.16 Employee Benefit Plans ................................................................................. 11
   4.17 Employment Compensation ........................................................................... 12
   4.18 Major Suppliers ............................................................................................. 12
   4.19 Affiliates' Relationships to the Seller ........................................................... 12
   4.20 Assets Necessary to Business ........................................................................ 12
   4.21 No Brokers or Finders ................................................................................... 12
   4.22 Disclosure ...................................................................................................... 12

5. REPRESENTATIONS AND WARRANTIES OF BUYER ............................................. 13
   5.1 Corporate ....................................................................................................... 13
   5.2 Authority ........................................................................................................ 13
   5.3 No Brokers or Finders ................................................................................... 13
   5.4 Disclosure ...................................................................................................... 13
   5.5 Buyer's Cooperation ...................................................................................... 13
   5.6 Other Action .................................................................................................. 13

6.   EMPLOYEES - EMPLOYEE BENEFITS.........................................................13
     6.1  Affected Employees ...................................................................13
     6.2  Retained Responsibilities ...........................................................13
     6.3  Payroll Tax .............................................................................14
     6.4  Termination Benefits .................................................................14

7.   OTHER MATTERS .........................................................................14
     7.1  Pre-Closing Revenue and Expenses ...............................................14
     7.2  Post Closing Revenue and Expenses ..............................................14
     7.3  Noncompetition ........................................................................14
     7.4  Confidentiality.........................................................................15
     7.5  Non-Solicitation .......................................................................15
     7.6  Reasonableness of Restrictions; Reformation; Enforcement .................15
     7.7  Specific Performance .................................................................15

8.   FURTHER COVENANTS OF THE SELLER ..............................................16
     8.1  Clean Title ..............................................................................16
     8.2  Access to Information and Records.................................................16
     8.3  Conduct of Business Pending the Closing ........................................16
     8.4  Consents .................................................................................17
     8.5  Other Action ............................................................................17
     8.6  Disclosure ...............................................................................17

9.   CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS............................17
     9.1  Representations and Warranties True on the
          Closing Date ............................................................................17
     9.2  Compliance With Agreement .......................................................17
     9.3  Absence of Litigation .................................................................18
     9.4  Consents and Approvals ..............................................................18
     9.5  Estoppel Certificates..................................................................18

10.  INDEMNIFICATION........................................................................18
     10.1  By the Seller, SFC, Forrest Smith and Kimberly Smith  ....................18
     10.2  By Buyer................................................................................18
     10.3  Indemnification of Third-Party Claims .........................................19
     10.4  Payment ................................................................................19
     10.5  No Waiver .............................................................................20
     10.6  Survival of Indemnification........................................................20

11.  CLOSING....................................................................................20
     11.1  Closing Date ..........................................................................20
     11.2  Place of Closing ......................................................................20
     11.3  Documents to be Delivered by the Seller .......................................21
     11.4  Documents to be Delivered by Buyer ............................................21

12.  TERMINATION..............................................................................21
     12.1  Right of Termination Without Breach ...........................................21
     12.2  Termination for Breach ..............................................................21

13.  MISCELLANEOUS ..........................................................................22
     13.1  Disclosure Schedules.................................................................22
     13.2  Further Assurance ....................................................................22

::ODMA\PCDOCS\DOCS\151411\1

13.3 Disclosures and Announcements ........................................................................... 22
13.4 Assignment; Parties in Interest........................................................................... 22
13.5 Law Governing Agreement ................................................................................. 22
13.6 Amendment and Modification.............................................................................. 22
13.7 Notice .................................................................................................................. 22
13.8 Expenses.............................................................................................................. 22
13.9 Entire Agreement ............................................................................................... 22
13.10 Counterparts ..................................................................................................... 22
13.11 Headings ............................................................................................................ 22

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of March 5, 2003, and entered into by and between NAME OF OUTBACK AFFILIATE ("Buyer"), and SMITH FOODS LLC (the "Seller"), SMITH FOODS CORP., a Connecticut corporation ("SFC") and FORREST SMITH, individually, and KIMBERLY SMITH, individually.

### RECITALS

A.  The Seller as Franchisee, Forrest Smith and Kimberly Smith as Operating Partners, and Outback Steakhouse of Florida, Inc. ("OSF") (an affiliate of Buyer), as Franchisor, entered into that certain Outback Steakhouse Restaurant Franchise Agreement dated July 26, 1999 ("Franchise Agreement") pertaining to an Outback Steakhouse restaurant located at 23-48 Bell Boulevard, Bayside, New York 11360 (the "Restaurant").

B.  OSF, as Franchisor, has terminated the Franchise Agreement.

C.  Seller, SFC, certain affiliates of Seller, Forrest Smith, Kimberly Smith and OSF have entered into that certain Settlement Agreement dated effective February 7, 2003 ("Settlement Agreement") pursuant to which Seller agreed, among other things, to sell the Restaurant assets to OSF or an assignee of OSF who is an affiliate of OSF

D.  Buyer is an affiliate of OSF and OSF has assigned its rights and obligations to purchase the Restaurant to Buyer.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows.

## 1.  PURCHASE OF THE RESTAURANTS

1.1  <u>Purchase of the Restaurants</u>.

1.1(a)  <u>Purchased Assets</u>.  Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in **Section 11.1**), the Seller shall sell, transfer, convey, assign and deliver to Buyer (or upon Buyer's request, to an Affiliate of Buyer) and Buyer shall purchase and accept all of the business, rights, claims and assets (of every kind, nature, character and description, whether real, personal or mixed, whether tangible or intangible, whether accrued, contingent or otherwise, and wherever situated) of the Seller used in the operation of or related to the Restaurant, together with all rights and privileges associated with such assets and with the Restaurant, other than the Excluded Assets (as hereinafter defined) (collectively the "Purchased Assets"), free and clear of any debts, liabilities, liens, claims, encumbrances or obligations whatsoever other than the Assumed Liabilities, as hereafter defined.  The Purchased Assets shall include, but not be limited to, those assets listed in **Article 2** hereof.

1.2  <u>Purchase Price</u>.  The purchase price for the Purchased Assets shall be [Insert purchase price from Settlement Agreement], subject to adjustment as provided in Section 1.3 and as provided in the Settlement Agreement ("Purchase Price").  The Purchase Price shall be paid as provided in the Settlement Agreement.

1.3  <u>Adjustment to Purchase Price</u>.

1.3(a)  <u>Credits to Seller</u>.  Seller shall receive a credit increasing the Purchase Price in an amount equal to:

(i) cash security deposits under the Real Property Lease to the extent such cash security deposits continue in effect to Buyer's benefit after the Closing. Seller shall cooperate with Buyer in Buyer's efforts to provide alternatives to such cash security deposits (whether letters of credit or guaranty by Buyer's parent corporation) acceptable to the landlord. Seller shall not receive a credit for any security deposit in the form of letters of credit or any form other than cash, such non-cash security deposits to be cancelled and Buyer to provide the landlord with substitutes therefore. Seller shall not receive a credit for any cash security deposit to the extent such cash security deposit is or has been applied by the landlord to any of Seller's obligations under the Real Property Lease for periods prior to the Closing Date.

(ii)     any excess working capital of the Restaurant as of the Closing Date.

1.3(b)   Credits to Buyer.   Buyer shall assume and Buyer shall receive a credit against the Purchase Price in an amount equal to:

(i)     any deficiency in working capital of the Restaurant as of the Closing Date.

(ii)     all vacation, holiday and sick pay unpaid by the Seller as of the Closing Date attributable to any period or partial period of employment by the Seller prior to the Closing Date, plus employee payroll taxes applicable thereto due or to become due, for those employees of the Seller who will be employed by Buyer after the Closing Date and who have not as of the Closing Date taken vacation, holiday or sick time earned prior to the Closing Date; and

(iii)     the amount of unredeemed gift certificates.

(iv)     Any liability (other than any Assumed Liability) of the Restaurant which Buyer hereafter agrees in writing to pay.

1.4     Allocation of Purchase Price.   The aggregate Purchase Price (including the assumption by Buyer of the Assumed Liabilities) shall be allocated among the Purchased Assets for tax purposes in accordance with the provisions of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations thereunder. The Seller and Buyer will follow and use such allocation in all tax returns, filings or other related reports made by them to any governmental agencies. To the extent that disclosures of this allocation are required to be made by the parties to the Internal Revenue Service ("IRS"), Buyer and the Seller will disclose such reports to the other prior to filing with the IRS.

## 2.     TRANSFER OF ASSETS

2.1     Definition of Purchased Assets.  The Purchased Assets shall include, but not be limited to, the following:

2.1(a)   Leased Real Property.   The lease of real property with respect to the Restaurant premises (the "Real Property Lease") as more particularly described on **Schedule 2.1(a)** with respect to the real property described thereon (the "Leased Real Property") and all fixtures and leasehold improvements.

2.1(b)   Personal Property.   All machinery, equipment, vehicles, tools, supplies, spare parts, furniture, fixtures, furnishings, smallwares and all other personal property owned, utilized or held for use by the Seller in connection with the operation of the Restaurant.

2.1(c)   Inventory.   All inventory held by the Seller on the Closing Date.

2.1(d)  Contracts.  Except as otherwise specifically provided herein, all rights in, to and under all contracts and purchase orders (hereinafter "Contracts") of the Seller specified on **Schedule 2.1(d)**. To the extent that any Contract specified on **Schedule 2.1(d)** is not assignable without the consent of another party, this Agreement shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof.  The Seller and Buyer agree to use their reasonable best efforts (without any requirement on the part of Buyer or Seller to pay any money or, on the part of Buyer, to agree to any change in the terms of any such Contract) to obtain the consent of such other party to the assignment of any such Contract to Buyer in all cases in which such consent is or may be required for such assignment.  If any such consent shall not be obtained, the Seller agrees to cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits intended to be assigned to Buyer under the relevant Contract, including enforcement at the cost and for the account of Buyer of any and all rights of the Seller against the other party thereto arising out of the breach or cancellation thereof by such other party or otherwise. If and to the extent that such arrangement cannot be made, Buyer, upon notice, shall have no obligation pursuant to **Section 3.2** or otherwise with respect to any such Contract and any such Contract shall not be deemed to be a Purchased Asset hereunder.

Notwithstanding the foregoing, Buyer shall not be required to assume, and the Purchased Assets shall not include, (i) any Contract which Buyer determines, in its reasonable discretion, to be on terms which do not reflect terms which could be obtained from an unrelated party in an arm's length, good faith transaction and (ii) any Contract for goods or services to the extent such expenditure, goods or services required the consent of Buyer as Franchisor under the Franchise Agreement and such consent was not obtained. Buyer shall notify Seller prior to the Closing of which Contracts Buyer elects not to assume and **Schedule 2.1(d)** shall be revised accordingly.

2.1(e)  Computer Software.  All computer source codes, programs and other software of the Seller, including all machine-readable code, printed listings of code, documentation and related property and information of the Seller.

2.1(f)  Literature.  All menus, sales literature and promotional literature and similar materials of the Seller.

2.1(g)  Records and Files.  All records, files, invoices, supplier lists, blueprints, specifications, designs, drawings, accounting records, business records, operating data and other data of the Seller. Buyer shall retain such materials for a period of six (6) years and shall provide Seller and its representatives reasonable access to such materials for all legitimate purposes relating to the winding up of Seller's affairs.

2.1(h)  Notes and Accounts Receivable.  All notes, drafts and accounts receivable of the Seller.

2.1(i)  Licenses: Permits.  All licenses, permits and approvals of the Seller to the extent the same may be assigned to Buyer.

2.1 (j)  Alcoholic Beverage License.  Seller's license to serve alcoholic beverages at the Restaurant to the extent assignable or transferrable.

2.1(k)  General Intangibles.  All causes of action arising out of occurrences before or after the Closing Date, and all other intangible rights and assets of the Seller.

2.2     Prorations.  The following prorations relating to the Purchased Assets will be made as of the Closing Date, with the Seller liable to the extent such items relate to any time period up to and including the Closing Date and Buyer liable to the extent such items relate to periods subsequent to the Closing Date.  The net amount of all such prorations will be settled and paid on the Closing Date, if possible, and if not possible then as soon as practicable thereafter.

2.2(a)   Personal property taxes, real estate taxes and assessments, and other taxes, if any, on or with respect to the Purchased Assets; provided that special assessments levied prior to the Closing Date shall be paid by the Seller.

2.2(b)   Rents, additional rents, taxes and other items payable by the Seller under any lease, license, permit, contract or other agreement or arrangement to be assigned to or assumed by Buyer.

2.2(c)   The amount of rents, taxes and charges for sewer, water, fuel, telephone, electricity and other utilities; provided that if practicable, meter readings shall be taken on the applicable Closing Date and the respective obligations of the parties determined in accordance with such readings.

If the actual expense of any of the above items for the billing period within which the Closing Date falls is not known on the Closing Date, the proration shall be made as soon as such actual expense becomes known.  The Seller agrees to furnish Buyer with such documents and other records as shall be reasonably requested in order to confirm all proration calculations.

2.3     Excluded Assets.  The provisions of **Section 2.1** notwithstanding, the Seller shall not sell, transfer, assign, convey or deliver to Buyer, and Buyer will not purchase or accept the following assets of the Seller (collectively the "Excluded Assets"):

2.3(a)   Cash and Cash Equivalents.  All cash and cash equivalents, other than petty cash balances at the Restaurant

2.3(b)   Consideration.  The consideration delivered by Buyer pursuant to this Agreement, Seller's other rights under or in connection with this Agreement, the Escrow Agreement, the Escrow Account and any other agreements or instruments contemplated hereby or thereby.

2.3(c)   Tax Credits and Records.  Federal, state and local income and franchise tax credits and tax refund claims and associated returns and records; provided however, Buyer shall have reasonable access to such returns and records and may make excerpts therefrom and copies thereof.

2.3(d)   Organizational Documents.  The Seller, its Articles of Organization, Operating Agreement, minute book and other records having exclusively to do with the organization and capitalization of the Seller; provided however, Buyer shall have reasonable access to such books and records and may make excerpts therefrom and copies thereof.

2.3(e)   Employee Records.  Any and all employee books and records to the extent that such transfer of books and records would be in violation of any laws.

3.    **LIABILITIES**

3.1    Liabilities Not to be Assumed. As used in this Agreement, the term "Liability" shall mean and include any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured. The Seller agrees to timely pay and discharge all Liabilities which relate to periods on or before the Closing Date. Except as and to the extent specifically set forth in **Section 3.2**, Buyer is not assuming any Liabilities of the Seller and all such Liabilities shall be and remain the responsibility of the Seller. Without limiting the generality of the foregoing, Buyer is not assuming and the Seller shall not be deemed to have transferred to Buyer the following Liabilities of the Seller:

3.1(a)    Income and Franchise Taxes. Any Liability of the Seller for Federal income taxes and any state or local income, profit, sales, excise or franchise taxes (and any penalties or interest due on account thereof).

3.1(b)    Insured Claims. Any Liability insured against, to the extent such Liability is or will be paid by an insurer.

3.1(c)    Litigation Matters. Any Liability with respect to any action, suit, proceeding, arbitration, investigation or inquiry, whether civil, criminal or administrative ("Litigation"), whether or not described in **Schedule 4.10**.

3.1(d)    Infringements. Any Liability to a third party for infringement of such third party's Trade Rights.

3.1(e)    Transaction Expenses. Al Liabilities incurred by Seller in connection with this Agreement and the transactions contemplated herein.

3.1(f)    Liability For Breach. Liabilities of the Seller for any breach or failure to perform any of the Seller's covenants and agreements contained in, or made pursuant to, this Agreement, or, prior to the Closing Date, any other contract, whether or not assumed hereunder, including breach arising from assignment of contracts hereunder without consent of third parties.

3.1(g)    Liabilities to Affiliates. Liabilities to present or former Affiliates of Seller.

3.1(h)    Violation of Laws or Orders. Liabilities for any violation of or failure to comply with any statute, law, ordinance, rule or regulation (collectively, "Laws") or any order, writ, injunction, judgment, plan or decree (collectively, "Orders") of any court, arbitrator, department, commission, board, bureau, agency, authority, instrumentality or other body, whether federal, state, municipal, foreign or other (collectively, "Government Entities").

3.2    Liabilities to be Assumed. Subject to the terms and conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to perform and discharge the following, and only the following Liabilities of the Seller (collectively the "Assumed Liabilities"):

3.2(a)    Contractual Liabilities. The Seller's Liabilities arising from events occurring after the Closing Date under and pursuant to the following Contracts:

(i)    The Real Property Leases specified in **Schedule 2.1(a)**.

(ii)    The employments agreements between Seller, as employer, and the Operations Director and the Proprietor for the Restaurant, as employee.

(iii)    All Contracts assumed by Buyer and described in **Schedule 2.1(d)**; and

(iv)    Every Contract entered into by the Seller in the ordinary course of business for the purchase of food, beverages or supplies for the Restaurant or which does not involve consideration or other expenditure by the Seller payable in excess of One Thousand Dollars ($1,000).

The Contracts described in **Sections 3.2(a)(i), (ii) and (iii)** above are hereinafter collectively described as the "Assumed Contracts." The Buyer agrees to indemnify, defend and hold harmless Forrest Smith and Kimberly Smith for any Liability, including reasonable attorneys' fees, resulting from any and all guarantees executed in connection with the Real Property Leases assumed by the Buyer pursuant to **Section 3.2(a)(i)** above, to the extent such Liability arises out of any events first occurring subsequent to the Closing Date.

3.2(b)   Liabilities Under Permits and Licenses. The Seller's Liabilities arising from events occurring after the Closing Date under any permits or licenses listed in **Schedule 3.2(b)** and assigned to Buyer at the Closing.

3.2(c)   Other Obligations. The obligations set forth in **Section 1.3(b)** above, to the extent of the credit received by Buyer.

# 4.    REPRESENTATIONS AND WARRANTIES OF THE SELLER, SFC, FORREST SMITH AND KIMBERLY SMITH

The Seller, SFC Forrest Smith and Kimberly Smith, jointly and severally, represent and warrant to Buyer that, each of the following is true and correct in all material respects on the date hereof except to the extent identified in disclosure schedules referred to below in this **Section 4** and attached to this Agreement ("Disclosure Schedules"), shall remain true and correct in all material respects to and including the Closing Date and shall be unaffected by any investigation heretofore or hereafter made by Buyer, or, except as specifically provided herein, any knowledge of Buyer, and shall survive the closing of the transactions provided for herein for two (2) years from the Closing Date.

4.1    General.

4.1(a)   Organization. The Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York. SFC is the sole Manager of Seller. Forrest and Kimberly are the sole shareholders and directors of SFC.

4.1(b)   Power. The Seller has all requisite limited liability company power and authority to own, operate and lease its properties, to carry on its businesses as and where such are now being conducted, to enter into this Agreement and the other documents and instruments to be executed and delivered by the Seller pursuant hereto and to carry out the transactions contemplated hereby and thereby.

4.1(c)   Qualification. The Seller is duly licensed or qualified to do business as a foreign entity, and it is in good standing, in each jurisdiction wherein the character of the properties owned or leased is, or the nature of its business, makes such licensing or qualification necessary.

4.1(d)   No Subsidiaries. The Seller does not own any interest in any corporation, partnership or other entity.

4.2     Authority.  The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by the Seller pursuant hereto and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of the Seller and all necessary corporate action on the part of SFC.  No other or further act or proceeding on the part of the Seller or SFC is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered by the Seller pursuant hereto or the consummation of the transactions contemplated hereby and thereby.  This Agreement constitutes. and when executed and delivered, the other documents and instruments to be executed and delivered by the Seller pursuant hereto will constitute, valid binding agreements of the Seller, SFC, Forrest and Kimberly enforceable in accordance with their respective terms, except as such may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and by general equitable principles.

4.3     No Violation.  Except as set forth on **Schedule 4.3**, neither the execution and delivery of this Agreement or the other documents and instruments to be executed and delivered by the Seller pursuant hereto, nor the consummation by the Seller of the transactions contemplated hereby and thereby (a) will violate any applicable Law or Order, or (b) will require any authorization, consent, approval, exemption or other action by or notice to any Government Entity, or (c) subject to obtaining the consents referred to in **Schedule 4.3**, will violate or conflict with, or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or will result in the termination of. or accelerate the performance required by, or result in the creation of any Lien (as defined in **Section 4.12(a)**) upon any of the assets of the Seller under, any term or provision of the Articles of Organization or Operating Agreement of the Seller or of any material contract, commitment, understanding, arrangement, agreement or restriction of any kind or character to which the Seller is a party or by which the Seller or any of its assets or properties may be bound or affected.

4.4     Financial Statements.  Included as **Schedule 4.4** are true and complete copies of the financial statements of the Seller consisting of (i) balance sheets of the Seller as of December 31, 2002 ("Recent Balance Sheet")  and the related statements of income and cash flows for the year then ended (including the notes contained therein or annexed thereto).  Such financial statements (including all notes and schedules contained therein or annexed thereto) have been prepared in accordance with the books and records of the Seller, and fairly present, the assets, liabilities and financial position, the results of operations and cash flows of the Seller as of the dates and for the years and periods indicated.

4.5     Tax Matters.  Except as set forth on **Schedule 4.5** all state, county, local and other tax returns required to be filed by or on behalf of the Seller have been timely filed and when filed were true and correct in all material respects, and the taxes shown as due thereon were paid or adequately accrued.  The Seller has duly withheld and paid all taxes that it is required to withhold and pay relating to salaries and other compensation heretofore paid to the employees of the Seller.

4.6     Accounts Receivable.  All accounts receivable of the Seller reflected on the Recent Balance Sheet. and as incurred in the normal course of business since the date thereof represent arm's length transactions actually made in the ordinary course of business; to the best of the Seller's knowledge, are collectible (net of the reserves shown on the Recent Balance Sheet for doubtful accounts) in the ordinary course of business without the necessity of commencing legal proceedings; are subject to no counterclaim or setoff; and are not in dispute.

4.7     Inventory.  All inventory of the Seller reflected on the Recent Balance Sheet consisted of a quality and quantity usable and saleable in the ordinary course of business. had a commercial value at least equal to the value shown on such balance sheet and was valued in accordance with GAAP.  All inventory purchased since the date of such balance sheet consisted of a quality and quantity usable and saleable in the ordinary course of business.  All current inventory of the Seller is located at the Restaurant premises.

4.8     Absence of Certain Changes.  Except as and to the extent set forth in **Schedule 4.8**, since the date of the Recent Balance Sheet there has not been:

4.8(a)   No Adverse Change.  Any material adverse change in the financial condition, assets, Liabilities. business, prospects or operations of the Seller;

4.8(b)   No Damage.  Any material loss, damage or destruction. whether covered by insurance or not, affecting Seller's business or properties;

4.8(c)   No Increase in Compensation.  Other than such thereof as has occurred in the ordinary course of business, any increase in the compensation, salaries or wages payable or to become payable to any employee of the Seller (including, without limitation, any increase or change pursuant to any bonus, pension, profit sharing, retirement or other plan or commitment), or any bonus or other employee benefit granted, made or accrued;

4.8(d)   No Labor Disputes.  Any labor dispute or disturbance, other than routine individual grievances which are not material to the business, financial condition or results of operations of the Seller;

4.8(e)   No Commitments.  Any material commitment or transaction by the Seller (including, without limitation, any borrowing or capital expenditure) other than  in the ordinary course of business consistent with past practice;

4.8(f)   No Disposition of Property.  Any sale, lease or other transfer or disposition of any properties or assets of the Seller, except in the ordinary course of business;

4.8(g)   No Indebtedness.   Any indebtedness for borrowed money incurred, assumed or guaranteed by the Seller;

4.8(h)   No Liens.  Any Lien made on any of the properties or assets of the Seller other than liens for taxes not yet due and payable;

4.8(i)   No Amendment of Contracts.  Any entering into, amendment or termination by the Seller of any contract, or any waiver of material rights thereunder, other than in the ordinary course of business;

4.9     Absence of Undisclosed Liabilities.  Except as and to the extent specifically disclosed in the Recent Balance Sheet, or in **Schedule 4.9**, the Seller does not have any Liabilities other than liabilities and obligations incurred since the date of the Recent Balance Sheet in the ordinary course of business and consistent with past practice and none of which has or will have a material adverse effect on the business, financial condition or results of operations of the Seller.  Except as and to the extent described in the Recent Balance Sheet or in **Schedule 4.9**, the Seller has no knowledge of any basis for the assertion against the Seller of any Liability and to the knowledge of the Seller, there are no circumstances, conditions, happenings, events or arrangements, contractual or otherwise. which may give rise to Liabilities. except for liabilities and obligations incurred in the ordinary course of the Seller's business.

4.10    No Litigation.  Except as set forth in **Schedule 4.10** there is no Litigation pending or, to the knowledge of the Seller, threatened against the Seller. its managers or members (in such capacity), its business or its assets, nor does the Seller know, or have grounds to know, of any basis for any such Litigation. **Schedule 4.10** also identifies all Litigation to which the Seller or its managers or members (in such capacity) have been parties since July 31, 1998. Except as set forth in **Schedule 4.10**, neither the Seller nor its business or assets are subject to any Order of any Government Entity.

4.11    Compliance With Laws and Orders.

4.11(a) Compliance.   Except as set forth in **Schedule 4.11(a)**, the Seller (including its operations, practices, properties and assets) is in material compliance with all applicable Laws and Orders, including, without limitation, those applicable to discrimination in employment, occupational safety and health, trade practices, competition and pricing, product warranties, zoning, building and sanitation, employment, retirement and labor relations and product advertising. Except as set forth in **Schedule 4.11(a)**, the Seller has not received notice of any violation or alleged violation of, and is subject to no Liability for past or continuing violation of, any Laws or Orders. All reports and returns required to be filed by the Seller with any Government Entity have been filed, and were accurate and complete when filed. Without limiting the generality of the foregoing the Seller has made all required payments to its unemployment compensation reserve accounts with the appropriate governmental departments of the states where it is required to maintain such accounts, and each of such accounts has a positive balance.

4.11(b) Licenses and Permits.   Except as set forth on **Schedule 4.11(b)**, the Seller has, or will have on the Closing Date, all licenses, permits, approvals, authorizations and consents of all Government Entities and all certification organizations required for the conduct of the business (as presently conducted and as proposed to be conducted by the Seller) and operation of the Restaurants. Except as disclosed on **Schedule 4.11(b)**, all such licenses, permits, approvals, authorizations and consents as described in **Schedule 4.11(b)**, are in full force and effect and are assignable to Buyer in accordance with the terms hereof. Except as set forth in **Schedule 4.11(b)**, the Seller (including its operations, properties and assets) is and has been in compliance with all such permits and licenses, approvals, authorizations and consents.

4.12    Title to and Condition of Properties.

4.12(a) Marketable Title.   The Seller has, or will have on the Closing Date, good and marketable title to all the Purchased Assets, free and clear of all mortgages, liens (statutory or otherwise), security interests, claims, pledges, licenses, equities, options, conditional sales contracts, assessments, levies, easements, covenants, reservations, restrictions, rights-of-way, exceptions, limitations, charges or encumbrances of any nature whatsoever except for taxes not yet due and payable and the interests of the lessors under Real Property Leases (collectively, "Liens"). Except as described on **Schedule 4.12(a)**, none of the Purchased Assets are subject to any restrictions with respect to the transferability thereof. Except as described on **Schedule 4.12(a)**, the Seller has complete and unrestricted power and right to sell, assign, convey and deliver the Purchased Assets to Buyer as contemplated hereby. On the Closing Date, Buyer will receive good and marketable title to all the Purchased Assets, free and clear of all Liens of any nature whatsoever.

4.12(b) Condition.   All tangible assets (real and personal) constituting Purchased Assets hereunder are in good operating condition and repair, free from any defects (except such minor defects as do not interfere with the use thereof in the conduct of the normal operations of the Seller), have been maintained consistent with the standards generally followed in the industry and are sufficient to carry on the business of the Seller as conducted during the preceding twelve (12) months. All buildings and other structures constituting the Restaurants' premises are in good condition and repair and have no structural defects or defects affecting the plumbing, electrical, sewerage, or heating, ventilating or air conditioning systems.

4.12(c) Real Property.   **Schedule 2.1(a)** sets forth all real property presently used or occupied by the Seller and its Restaurant (the "Real Property"). There are now in full force and effect duly issued certificates of occupancy permitting the Real Property and improvements located thereon to be legally used and occupied as the same are now constituted. All of the Real Property has permanent

rights of access to dedicated public highways.  To the knowledge of the Seller, no fact or condition exists which would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads and there is no pending or threatened restriction or denial, governmental or otherwise, upon such ingress and egress.  To the Seller's knowledge, no public improvements have been commenced and to Seller's knowledge none are planned which in either case may result in special assessments against or otherwise materially adversely affect any Real Property.  To the Seller's knowledge, no portion of any of the Real Property has been used as a landfill or for storage or landfill of hazardous or toxic materials.  The Seller does not have notice or knowledge of any (i) Order requiring repair, alteration, or correction of any existing condition affecting any Real Property or the systems or improvements thereat, (ii) condition or defect which could give rise to an order of the sort referred to in "(i)" above, or (iii) underground storage tanks, or any structural, mechanical, or other defects of material significance affecting any Real Property or the systems or improvements thereat (including, but not limited to, inadequacy for normal use of mechanical systems or disposal or water systems at or serving the Real Property).

4.13    Insurance.  Set forth in **Schedule 4.13** is a complete and accurate list of all policies of fire, liability, product liability, workers compensation, health and other forms of insurance presently in effect with respect to the business and properties of the Seller, true and correct copies of which have heretofore been made available to Buyer for its inspection.  No notice of cancellation or termination has been received with respect to any such policy, and the Seller has no knowledge of any act or omission of the Seller that could result in cancellation of any such policy prior to the Closing Date.

4.14    Contracts and Commitments.

4.14(a) Real Property Leases.  Except as set forth in **Schedule 2.1(a)**, the Seller has no leases of real property.  The Real Property Lease is in full force and effect, the Seller is not in default of any term, covenant or obligation under any of the Real Property Lease, and no condition exists which, with the passage of time or giving of notice, would constitute a default under any term, covenant or obligation of Seller under any Real Property Lease.

4.14(b) Personal Property Leases.  The Seller has no leases of personal property.

4.14(c) Purchase Commitments.  The Seller has no purchase commitments for inventory items or supplies that, together with amounts on hand, constitute in excess of two (2) months normal usage, or which are at an excessive price.

4.14(d) Collective Bargaining Agreements.  The Seller is not a party to any collective bargaining agreement with any unions, guilds, shop committees or other collective bargaining groups.

4.14(e) Loan Agreements.  Except as set forth in **Schedule 4.14(e)**, the Seller is not obligated under any loan agreement, promissory note, letter of credit, or other evidence of indebtedness for borrowed money as a signatory, guarantor or otherwise.

4.14(f) Guarantees.  Except as disclosed on **Schedule 4.14(f)**, the Seller has not guaranteed the payment or performance of any person, firm or corporation, agreed to indemnify any person or act as a surety, or otherwise agreed to be contingently or secondarily liable for the obligations of any person.

4.14(g) Burdensome or Restrictive Agreements. The Seller is not a party to or bound by any agreement, deed, lease or other instrument which is so burdensome as to materially and adversely affect or impair the operation of the Restaurant. Without limiting the generality of the foregoing, the Seller is not a party to or bound by any agreement requiring it to assign any interest in any trade secret or proprietary information, or prohibiting or restricting it from competing in any business or geographical

area or soliciting customers or otherwise restricting it from carrying on its business anywhere in the world.

4.14(h) Other Material Contracts. The Seller does not have a lease, license, contract or commitment of any nature involving consideration or other expenditure in excess of one thousand dollars ($1,000), or involving performance over a period of more than twelve (12) months, or which is otherwise individually material to the operations of the Restaurants, except as described in **Schedule 4.14(h)** or in any other Disclosure Schedule.

4.15   Labor Matters. The Seller has not experienced any labor disputes, union organization attempts or any work stoppage due to labor disagreements in connection with its business; (a) the Seller is in compliance with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and is not engaged in any unfair labor practice; (b) there is no unfair labor practice charge or complaint against the Seller pending or threatened; (c) there is no labor strike, dispute, request for representation, slowdown or stoppage actually pending or threatened against or affecting the Seller; (d) no question concerning representation has been raised or is threatened respecting the employees of the Seller; (e) no grievance which might have a material adverse effect on the Seller, nor any arbitration proceeding arising out of or under collective bargaining agreements, is pending and no such claim therefor exists; and (f) there are no administrative charges or court complaints against the Seller concerning alleged employment discrimination or other employment related matters pending or threatened before the U.S. Equal Employment Opportunity Commission or any Government Entity, except as disclosed on **Schedule 4.10**.

4.16   Employee Benefit Plans.

The Seller has provided and/or identified on **Schedule 4.16** each "employee benefit plan," as defined in Section 3(3) of ERISA which (i) is subject to any provision of ERISA and (ii) is or was at any time during the last 5 years maintained, administered or contributed to by the Seller or any affiliate (as defined in Section 407(d)(7) of ERISA) and covers any employee or former employee of the Seller or any affiliate or under which the Seller or any affiliate has any liability. Such plans are referred to collectively herein as the "Employee Plans." None of the Employee Plans would, individually or collectively, constitute an "employee pension benefit plan" as defined in Section 3(2) of ERISA, including, without limitation, a "multiemployer plan," as defined in Section 3(37) of ERISA, or a "defined benefit plan," as defined in Section 3(35) and subject to Title IV of ERISA, and no Employee Plan is maintained in connection with any trust described in Section 501(c)(9) of the Code. It is understood and agreed that Buyer is not assuming any Employee Plans or liabilities associated therewith, and that the Seller shall retain all such Employee Plans, including all obligations deriving directly or indirectly from sponsoring or participating in such Employee Plans.

Each Employee Plan has been maintained in compliance with its terms and the requirements prescribed by any and all statutes, orders, rules and regulations, including but not limited to, ERISA and the Code, which are applicable to such Plan. No assets of the Seller are or could be subject, directly or indirectly, to any liability or lien by reason of any action or inaction taken with respect to any Employee Plan maintained by the Seller.

The Seller has no liability in respect of post-retirement health and medical benefits for retired employees of the Seller or any affiliate, determined using assumptions that are reasonable in the aggregate, over the fair market value of any fund, reserve or other assets segregated for the purpose of satisfying such liability (including for such purposes any fund established pursuant to Section 401(h) of the Code). The Seller has reserved its right to amend or terminate any Employee Plan or other benefit arrangement providing health or medical benefits in respect of any active employee of the Seller under the terms of any such plan and descriptions thereof given to employees. With respect to any Employee Plans which are "group health plans" under Section 4980B of the Code and Section 607(l) of ERISA, there has been timely compliance in all material

respects with all requirements imposed thereunder, and under Parts 6 and 7 of Title 1 of ERISA generally, so that the Seller and any affiliate have no (and will not incur any) loss, assessment, tax penalty or other sanction with respect to any such plan.

There has been no amendment to, written interpretation or announcement (whether or not written) by the Seller or any affiliate relating to, or change in employee participation or coverage under, any Employee Plan which would increase the expense of maintaining such Employee Plan above the level of the expense incurred in respect thereof for the fiscal year ended immediately prior to the Closing Date.

4.19   Affiliates' Relationships to the Seller. As of the Closing Date, no Affiliate of the Seller will have any direct or indirect interest in (i) any entity which does business with the Seller or (ii) any entity which is engaged in a business competitive with the Seller's business of steakhouse restaurants, or (iii) any property, asset or right which is used by the Seller in the conduct of the business of the Restaurant.

4.20   Assets Necessary to Business. The Purchased Assets include all property and assets (except for the Excluded Assets), tangible and intangible, and all leases, licenses and other agreements, which are necessary to permit Buyer to carry on, or currently used or held for use in, the business of the Restaurant as presently conducted and as conducted immediately prior to the Closing Date.

4.21   No Brokers or Finders. Neither the Seller nor any of its managers, officers, employees, members or agents have retained, employed or used any broker or finder in connection with the transaction provided for herein or in connection with the negotiation thereof.

4.22   Disclosure. No representation or warranty by the Seller in this Agreement, nor any statement, certificate, schedule, document or exhibit hereto furnished or to be furnished by or on behalf of the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading. All statements and information contained in any certificate or Disclosure Schedule delivered by or on behalf of the Seller shall be deemed representations and warranties of the Seller.

## 5.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer represents and warrants to the Seller that each of the following is true and correct in all material respects on the date hereof, shall remain true and correct in all material respects to and including the Closing Date, shall be unaffected by any investigation heretofore or hereafter made by the Seller or any knowledge of the Seller, and shall survive the closing of the transactions provided for herein for the longer of: two (2) years from the Closing Date; or through the date the Final Purchase Price is determined for all three Restaurants.

5.1.   Corporate.

5.1(a)   Organization. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.

5.1(b)   Corporate Power. Buyer has all requisite corporate power to enter into this Agreement and the other documents and instruments to be executed and delivered by Buyer and to carry out the transactions contemplated hereby and thereby.

5.2   Authority. The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and the consummation of the transactions

contemplated hereby and thereby have been duly authorized by the Board of Directors of Buyer. No other corporate act or proceeding on the part of Buyer or its shareholders is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered by Buyer pursuant hereto or the consummation of the transactions contemplated hereby and thereby. This Agreement constitutes, and when executed and delivered, the other documents and instruments to be executed and delivered by Buyer pursuant hereto will constitute, valid and binding agreements of Buyer, enforceable in accordance with their respective terms, except as such may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and by general equitable principles.

5.3   No Brokers or Finders. Neither Buyer nor any of its directors, officers, employees or agents have retained, employed or used any broker or finder in connection with the transaction provided for herein or in connection with the negotiation thereof.

5.4   Disclosure. No representation or warranty by Buyer in this Agreement, nor any statement, certificate, schedule, document or exhibit hereto furnished or to be furnished by or on behalf of Buyer pursuant to this Agreement or in connection with transactions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading.

5.5.   Buyer's Cooperation. Buyer shall use its best efforts to cooperate with the Seller in obtaining the consents referred to in **Section 8.4** hereof.

5.6   Other Action. The Buyer shall use its best efforts to cause the fulfillment at the earliest practicable date of all the conditions to the parties' obligations to consummate the transactions contemplated in this Agreement.

**ó.   EMPLOYEES - EMPLOYEE BENEFITS**

6.1   Affected Employees. "Affected Employees" shall mean employees of the Seller who are employed by Buyer immediately after the Closing Date.

6.2   Retained Responsibilities. Subject to **Section 1.3(b)** above, the Seller agrees to satisfy, or cause its insurance carriers to satisfy, all claims for benefits, whether insured or otherwise (including, but not limited to, workers' compensation, life insurance, medical and disability programs), under Seller's employee benefit programs brought by, or in respect of, Affected Employees and other employees and former employees of the Seller, which claims arise out of events occurring on or prior to the Closing Date, in accordance with the terms and conditions of such programs or applicable workers' compensation statutes without interruption as a result of the employment by Buyer of any such employees after the Closing Date.

6.3   Payroll Tax. The Seller agrees to make a clean cut-off of payroll and payroll tax reporting with respect to the Affected Employees paying over to the federal, state and city governments those amounts respectively withheld or required to be withheld for periods ending on or prior to the Closing Date. The Seller also agrees to issue, by the date prescribed by IRS Regulations, Forms W-2 for wages paid through the Closing Date. Except as set forth in this Agreement, Buyer shall be responsible for all payroll and payroll tax obligations after the Closing Date for Affected Employees.

6.4   Termination Benefits. Subject to **Section 1.3(b)** above, and except as provided in the following sentence, Buyer shall be solely responsible for, and shall pay or cause to be paid, severance payments and other termination benefits, if any, to Affected Employees who may become entitled to such benefits by reason of any 'vents occurring after the Closing Date. Subject to **Section 1.3(b)** above, if any action on the part of the Seller prior to the Closing Date, or if the sale to Buyer of the business and assets of the Seller pursuant to this Agreement or the transactions contemplated hereby, or if the failure by Buyer to hire as a permanent employee

of Buyer any employee of Seller, shall directly or indirectly result in any Liability (i) for severance payments or termination benefits or (ii) by virtue of any state, federal or local law, such Liability shall be the sole responsibility of the Seller, and the Seller shall indemnify and hold harmless Buyer against such Liability.

## 7.   OTHER MATTERS

7.1    <u>Pre-Closing Revenue and Expenses</u>. The Seller shall be responsible for all expenses, debts and other Liabilities of the Seller and the Restaurants arising out of or relating to periods prior to and including the Closing Date.

7.2 .    <u>Post-Closing Revenue and Expenses</u>. The Buyer shall be responsible for all expenses, debts and other Liabilities of the Restaurants arising out of or relating to periods subsequent to the Closing Date.

7.3    <u>Noncompetition</u>. As an inducement to Buyer to execute this Agreement and complete the transactions contemplated hereby, and in order to preserve the goodwill associated with the business of the Seller being acquired pursuant to this Agreement, and in addition to and not in limitation of any covenants contained in any agreement executed and delivered pursuant to **Section 7.3** hereof, the Seller, SFC, Forrest Smith and Kimberly Smith agree as follows: for a period of two (2) years from the Closing Date, the Seller, SFC, Forrest Smith and Kimberly Smith and their Affiliates shall not, individually or jointly with others, directly or indirectly, whether for its own account or for that of any other Person, operate, engage in, own or hold any ownership interest in, have any interest in or lend any assistance to any steakhouse restaurant located within a thirty (30) mile radius of any Outback Steakhouse restaurant or Person or entity engaged in a business owning, operating or controlling any steakhouse restaurant located within a thirty (30) mile radius of any Outback Steakhouse restaurant, and the Seller, SFC, Forrest Smith and Kimberly Smith and their Affiliates shall not act as an officer, director, employee, partner, independent contractor, consultant, principal, agent or in any other capacity for, nor lend any assistance (financial or otherwise) or cooperation to, any such person or entity; provided, however, that it shall not be a violation of this **Section 7.3** for Seller, SFC, Forrest Smith or Kimberly Smith or their Affiliates to own a one percent (1%) or smaller interest in any corporation required to file periodic reports with the Securities and Exchange Commission so long as the Seller, SFC, Forrest Smith, Kimberly Smith and their Affiliates do not in any manner provide any services or assistance to such corporation. For the purposes hereof, the term "steakhouse restaurant" shall mean any restaurant for which: (i) the word "steak" or any variation thereof is in its name; (ii) the sale of steak or prime rib is featured in its advertising or marketing efforts; or (iii) the sale of steak and prime rib constitutes twenty percent (20%) or more of its entrée sales, computed on a dollar basis.

7.4    <u>Confidentiality</u>.

7.4(a)    <u>Definition</u>. For the purpose of this Agreement, "Proprietary Information" shall include all information, whether owned, licensed or otherwise used by or in the possession of the Seller, which reasonably would be considered proprietary or confidential to the business of the Seller or Buyer including but not limited to suppliers, customers, trade or industrial practices, marketing and technical plans, technology, personnel, organization or internal affairs, plans for products and ideas, recipes, menus, wine lists and proprietary techniques and other trade secrets. Notwithstanding the foregoing, "Proprietary Information" shall not include information which has entered the public domain.

7.4(b)    <u>No Disclosure, Use, or Circumvention</u>. The Seller and its Affiliates shall not disclose any Proprietary Information to any third parties and will not use any Proprietary Information in any business. The Seller shall not contact any suppliers, customers, employees, affiliates or associates to circumvent the purposes of this provision.

7.4(c)   <u>Maintenance of Confidentiality</u>. The Seller shall take all steps reasonably necessary or appropriate to maintain the strict confidentiality of the Proprietary Information and to assure compliance with this Agreement.

7.5   <u>Non-Solicitation</u>. For a period two (2) years following the Closing Date, the Seller, Forrest Smith, Kimberly Smith and their Affiliates shall not offer employment to any employee of the Buyer or its Affiliates or otherwise solicit or induce any employee of the Buyer or its Affiliates to terminate his or her employment, nor shall the Seller, Forrest Smith, Kimberly Smith or their Affiliates act as partner, consultant, agent, owner or part owner, or in any other capacity for any person or entity which solicits or otherwise induces any employee of the Buyer or its Affiliates to terminate his or her employment with the Buyer.

7.6   <u>Reasonableness of Restrictions; Reformation; Enforcement</u>. The parties hereto recognize and acknowledge that the limitations contained in **Sections 7.3, 7.4 and 7.5** hereof are reasonable and properly required for the adequate protection of the Buyer's interests. It is agreed by the parties hereto that if any portion of the restrictions contained in **Sections 7.3, 7.4 and 7.5** are held to be unreasonable, arbitrary, or against public policy, then the restrictions shall be considered divisible, both as to the time and as to the geographical area, with each month of the specified period being deemed a separate period of time and each radius mile of the restricted territory being deemed a separate geographical area, so that the lesser period of time or geographical area shall remain effective so long as the same is not unreasonable, arbitrary, or against public policy. The parties hereto agree that in the event any court of competent jurisdiction determines the specified period or the specified geographical area of the restricted territory to be unreasonable, arbitrary, or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary, and not against public policy may be enforced. If any of the covenants contained herein are violated and if any court action is instituted by the Buyer to prevent or enjoin such violation, the period of time during which the business activities shall be restricted, as provided in this Agreement, shall be lengthened by a period of time equal to the period between the date of the breach of the terms or covenants contained in this Agreement and the date on which the decree of the court disposing of the issues upon the merits shall become final and not subject to further appeal.

In the event it is necessary for the Buyer to initiate legal proceedings to enforce, interpret or construe any of the covenants contained in **Sections 7.3, 7.4 and 7.5** hereof, the prevailing party in such proceedings shall be entitled to receive from the non-prevailing party, in addition to all other remedies, all costs, including reasonable attorneys' fees, of such proceedings including appellate proceedings.

7.7   <u>Specific Performance</u>. The parties agree that a breach of any of the covenants contained in **Section 7.3, 7.4 and 7.5** hereof will cause irreparable injury to the Buyer for which the remedy at law will be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Buyer shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to obtain an injunction to restrain any threatened or actual activities in violation of any such covenants. The parties hereby consent and agree that temporary and permanent injunctive relief may be granted in any proceedings which might be brought to enforce any such covenants without the necessity of proof of actual damages, and in the event the Buyer does apply for such an injunction, that the Buyer has an adequate remedy at law shall not be raised as a defense.

8.   **FURTHER COVENANTS OF THE SELLER, SFC, FORREST SMITH AND KIMBERLY SMITH**

The Seller covenants and agrees as follows:

8.1   <u>Consent of Creditors</u>. Seller, SFC, Forrest Smith and Kimberly Smith shall use their best efforts in good faith to obtain and timely deliver to Buyer, the written consents of Lenders as required by Section 8 of the Settlement Agreement. Failure to do so shall constitute a default under this Asset Purchase

Agreement and under the Settlement Agreement.

    8.2    <u>Clear Title</u>. Seller, SFC, Forrest Smith and Kimberly Smith shall take all action necessary to deliver good and marketable title to the Purchased Assets to Buyer at the Closing, free and clear of any lien, claim, security interest, pledge or other encumbrance, perfected or unperfected, whatsoever. Seller, SFC, Forrest Smith and Kimberly Smith shall deliver to Buyer at Closing a waiver from each Lender waiving any claim to the Purchased Assets or the Restaurant other than claims to the Purchase Price to be paid as provided in the Settlement Agreement.

    8.3    <u>Access to Information and Records</u>. At all times prior to the Closing Date, the Seller shall give Buyer, its counsel, accountants and other representatives (i) access during normal business hours to all of the properties, books, records, contracts and documents of the Seller for the purpose of such inspection, investigation and testing as Buyer deems appropriate (and the Seller shall furnish or cause to be furnished to Buyer and its representatives all information with respect to the business and affairs of the Seller as Buyer may request); (ii) access to employees, agents and representatives for the purposes of such meetings and communications as Buyer reasonably desires; and (iii) access to creditors, vendors, customers, manufacturers of its machinery and equipment, and others having business dealings with the Seller, SFC, Forrest Smith or Kimberly Smith, it being the intent of the parties that Buyer shall have the right to discuss such matters as Outback determines appropriate for the purpose of facilitating the completion of the transactions contemplated herein, including the termination of the Franchise Agreements, the Settlement Agreement and the Asset Purchase Agreement, and the terms of the transactions provided for therein, with all creditors of Seller, SFC, Forrest Smith or Kimberly Smith .

    8.4    <u>Conduct of Business Pending the Closing</u>. From the date hereof until the Closing Date, except as otherwise approved in writing by the Buyer, which approval shall not be unreasonably withheld:

    8.4(a)    <u>No Changes</u>. The Seller will, in all material respects, carry on its business diligently and in the same manner as heretofore and, will not make or institute any material changes in its methods of purchase, sale, management, accounting or operation.

    8.4(b)    <u>Maintain Organization</u>. The Seller will take such action as may be necessary to maintain, preserve, renew and keep in favor the material rights and franchises of the Seller and will use its commercially reasonable best efforts, to the extent material hereto, to preserve the business organization of the Seller intact, to keep available to Buyer the present officers and employees, and to preserve for Buyer its present relationships with suppliers and customers and others having business relationships with the Seller.

    8.4(c)    <u>No Breach</u>. The Seller will not do or omit any act, or permit any omission to act, which may cause a breach of any material contract, commitment or obligation, or any breach of any representation, warranty, covenant or agreement made by the Seller herein, or which would have required disclosure on **Schedule 4.8** had it occurred after the date of the Recent Balance Sheet and prior to the date of this Agreement.

    8.4(d)    <u>No Material Contracts</u>. No contract or commitment will be entered into, by or on behalf of the Seller, except contracts, commitments, purchases or sales which are in the ordinary course of business and consistent with past practice, are not material to the Seller (individually or in the aggregate) and would not have been required to be disclosed in the Disclosure Schedule had they been in existence on the date of this Agreement.

    8.4(e)    <u>No Corporate Changes</u>. The Seller shall not materially amend its Articles of Organization or Operating Agreement or make any changes in ownership percentages.

8.4(f)   Maintenance of Insurance.  The Seller shall maintain all of the insurance in effect as of the date hereof.

8.4(g)   Maintenance of Property.  The Seller shall use, operate, maintain and repair all of their property in a normal business manner.

8.4(i)   No Negotiations.  The Seller will not directly or indirectly (through a representative or otherwise) solicit or furnish any information to any prospective buyer, commence, or conduct presently ongoing, negotiations with any other party or enter into any agreement with any other party concerning the sale of the Seller, any Restaurants, the Seller's assets or business or any part thereof or any membership interest in the Seller (an "acquisition proposal"), and the Seller shall immediately advise Buyer of the receipt of any acquisition proposal.

8.5   Consents.  The Seller will, prior to the Closing Date, obtain all consents necessary for the consummation of the transactions contemplated hereby.

8.6   Other Action.  The Seller shall cause the fulfillment at the earliest practicable date of all of the conditions to the parties' obligations to consummate the transactions contemplated in this Agreement.

8.7   Disclosure.  Through the Closing Date, the Seller shall have a continuing obligation to promptly notify Buyer in writing with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule, but no such disclosure shall cure any breach of any representation or warranty which is inaccurate.

# 9.   CONDITIONS PRECEDENT TO OBLIGATIONS

9.1   Conditions Precedent to Buyer's Obligations.  Each and every obligation of Buyer to be performed on the Closing Date shall be subject to the satisfaction prior to or on the Closing Date of each of the following conditions, any or all of which may be waived by Buyer in writing:

9.1(a)   Representations and Warranties True on the Closing Date.  Each of the representations and warranties made by the Seller in this Agreement, and the statements contained in the Disclosure Schedule or in any instrument, list, certificate or writing delivered by the Seller pursuant to this Agreement, shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, except for any changes permitted by the terms of this Agreement or consented to in writing by Buyer.

9.1(b)   Compliance With Agreement.  The Seller shall have in all material respects performed and complied with all of its agreements and obligations under this Agreement which are to be performed or complied with by it prior to or on the Closing Date, including the delivery of the closing documents specified in **Section 11.3.**

9.1(c)   Absence of Litigation.  No material Litigation shall have been commenced or threatened, and no material investigation by any Government Entity shall have been commenced, against Buyer, the Seller or any of the Affiliates, officers, directors or managers of any of them, which, in the reasonable judgment of Buyer, might materially impair Buyer's title to the Purchased Assets.

9.1(d)   Consents and Approvals.  Except as otherwise specifically provided in this Agreement, all approvals, consents and waivers that are required to effect the transactions contemplated hereby shall have been received, and copies thereof shall have been delivered to Buyer on or prior to the Closing Date.

9.1(e)   Estoppel Certificates.  The Seller shall use its best efforts to obtain and deliver to Buyer on or before the Closing Date an estoppel certificate or status letter from the landlord under the Real Property Lease which estoppel certificate or status letter will certify (i) the lease is valid and in full force and effect; (ii) the amounts payable by the Seller under the lease and the date to which the same have been paid; (iii) whether there are, to the knowledge of said landlord, any defaults thereunder, and, if so, specifying the nature thereof; and (iv) that the transactions contemplated by this Agreement will not constitute a default under the lease and that the landlord consents to the assignment of the lease to Buyer.

9.1(f)   Operations Director and Proprietor.  Buyer shall have assumed, as of the Closing Date, Seller's obligations the employment agreements with the Operations Director and the Proprietor of the Restaurant. Buyer shall use attempt to obtain from the Operations Director and Proprietor a release of the Seller from any claims in exchange for a release from Seller of any claims against the Operations Director or the Proprietor. Buyer shall indemnify Seller against any claim by the Operations Director or the Proprietor under their employment agreements to the extent such claim arises out of or relates to events occurring on or after the Closing Date.

9.2   Conditions Precedent to Seller's Obligations.  Each and every obligation of Seller to be performed on the Closing Date shall be subject to the satisfaction prior to or on the Closing Date of each of the following conditions, any or all of which may be waived by Seller in writing:

9.2(a)   Representations and Warranties True on the Closing Date.  Each of the representations and warranties made by the Buyer in this Agreement shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, except for any changes permitted by the terms of this Agreement or consented to in writing by Seller.

9.2(b)   Compliance With Agreement. The Buyer shall have in all material respects performed and complied with all of its agreements and obligations under this Agreement which are to be performed or complied with by it prior to or on the Closing Date, including the delivery of the closing documents specified in **Section 11.4.**

9.2(c)   Absence of Litigation.  No material Litigation shall have been commenced or threatened, and no material investigation by any Government Entity shall have been commenced, against Buyer, the Seller or any of the Affiliates, officers, directors or managers of any of them, with respect to the transactions contemplated hereby.

9.2(d)   Consents and Approvals.  Except as otherwise specifically provided in this Agreement, all approvals, consents and waivers that are required to effect the transactions contemplated hereby shall have been received, and copies thereof shall have been delivered to Seller on or prior to the Closing Date.

9.2(e)   Operations Director and Proprietor.  Buyer shall have assumed, as of the Closing Date, Seller's obligations the employment agreements with the Operations Director and the Proprietor of the Restaurant. Buyer shall use attempt to obtain from the Operations Director and Proprietor a release of the Seller from any claims in exchange for a release from Seller of any claims against the Operations Director or the Proprietor. Buyer shall indemnify Seller against any claim by the Operations Director or the Proprietor under their employment agreements to the extent such claim arises out of or relates to events occurring on or after the Closing Date.

## 10.   INDEMNIFICATION

10.1   By the Seller., SFC, Forrest Smith and Kimberly Smith.  Subject to the terms and conditions of this **Article 10**, the Seller, SFC, Forrest Smith and Kimberly Smith, jointly and severally, hereby agree to indemnify, defend and hold harmless Buyer, and its directors, officers, employees and Affiliates (hereinafter "Buyer's Indemnitees"), from and against all Claims asserted against, resulting to, imposed upon, or incurred by Buyer's Indemnitees or the business and assets transferred to Buyer pursuant to this Agreement, directly or indirectly, by reason of, arising out of or resulting from (a) the inaccuracy or breach of any representation or warranty of the Seller, SFC, Forrest Smith or Kimberly Smith contained in or made pursuant to this Agreement (regardless of whether such breach is deemed "material"); (b) the breach of or failure to perform any covenant or obligation of the Seller, SFC, Forrest Smith or Kimberly Smith contained in this Agreement (regardless of whether such breach is deemed "material"); or (c) any Claim against the Seller, SFC, Forrest Smith, Kimberly Smith, the Purchased Assets or the business of the Seller not specifically assumed by Buyer pursuant hereto or which arises out of or relates to any event first occurring on or prior to the Closing Date.  As used in this **Article 10**, the term "Claim" shall include (i) all Liabilities; (ii) all losses, damages (including, without limitation, consequential damages), judgments, awards, settlements approved by the Seller (such approval shall not be unreasonably withheld or delayed), costs and expenses (including, without limitation, interest (including prejudgment interest in any litigated matter), penalties, court costs and reasonable attorneys' fees and expenses); and (iii) all demands, claims, suits, actions, costs of investigation, causes of action, proceedings and assessments, whether or not ultimately determined to be valid.

10.2   By Buyer.  Subject to the terms and conditions of this **Article 10**, Buyer hereby agrees to indemnify, defend and hold harmless the Seller, its Affiliates, its managers, members, officers, employees and controlling persons, from and against all Claims asserted against, resulting to, imposed upon or incurred by any such person, directly or indirectly, by reason of or resulting from (a) the inaccuracy or breach of any representation or warranty of Buyer contained in or made pursuant to this Agreement (regardless of whether such breach is deemed "material"); (b) the breach of any covenant of Buyer contained in this Agreement (regardless of whether such breach is deemed "material"); or (c) all Claims of or against the Seller specifically assumed by Buyer in **Section 3.2 (b)** hereof or which relate to the Purchased Assets and arise out of any event first occurring after the Closing Date.

10.3   Indemnification of Third-Party Claims.  The obligations and liabilities of any party to indemnify any other under this **Article 10** with respect to Claims relating to third parties shall be subject to the following terms and conditions:

10.3(a) Notice and Defense.  The party or parties to be indemnified (whether one or more, the "Indemnified Party") will give the party from whom indemnification is sought (the "Indemnifying Party") written notice of any such Claim, and the Indemnifying Party will undertake the defense thereof by representatives chosen by it.  Failure to give such notice shall not affect the Indemnifying Party's duty or obligations under this **Article 10**, except to the extent the Indemnifying Party is prejudiced thereby.  So long as the Indemnifying Party is defending any such Claim actively and in good faith, the Indemnified Party shall not settle such Claim.  The Indemnified Party shall make available to the Indemnifying Party or its representatives all records and other materials required by them and in the possession or under the control of the Indemnified Party, for the use of the Indemnifying Party and its representatives in defending any such Claim, and shall in other respects give reasonable cooperation in such defense.

10.3(b) Failure to Defend.  If the Indemnifying Party, within a reasonable time after notice of any such Claim, fails to defend such Claim actively and in good faith, the Indemnified Party will (upon further notice) have the right to undertake the defense, compromise or settlement of such Claim or consent to the entry of a judgment with respect to such Claim, on behalf of and for the account and risk

of the Indemnifying Party, and the Indemnifying Party shall thereafter have no right to challenge the Indemnified Party's defense, compromise, settlement or consent to judgment.

10.3(c) Indemnified Party's Rights.   Anything in this **Article 10** to the contrary notwithstanding, (i) if there is a reasonable probability that a Claim may materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments, the Indemnified Party shall have the right to defend, compromise or settle such Claim, and (ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any Claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party of a release from all Liability in respect of such Claim.

10.4     Payment.  The Indemnifying Party shall promptly pay the Indemnified Party any amount due under this **Article 10,** which payment may be accomplished in whole or in part, at the option of the Indemnified Party, by the Indemnified Party setting off any amount owed to the Indemnifying Party by the Indemnified Party.  To the extent set-off is made by an Indemnified Party in satisfaction or partial satisfaction of an indemnity obligation under this **Article 10** that is disputed by the Indemnifying Party, upon a subsequent determination by final judgment not subject to appeal that all or a portion of such indemnity obligation was not owed to the Indemnified Party, the Indemnified Party shall pay the Indemnifying Party the amount which was set off and not owed together with interest from the date of set-off until the date of such payment at an annual rate equal to the average annual rate in effect as of the date of the set-off, on those three maturities of United States Treasury obligations having a remaining life, as of such date, closest to the period from the date of the set-off to the date of such judgment.  Upon judgment, determination, settlement or compromise of any third party Claim, the Indemnifying Party shall pay promptly on behalf of the Indemnified Party, and/or to the Indemnified Party in reimbursement of any amount theretofore required to be paid by it, the amount so determined by judgment, determination, settlement or compromise and all other Claims of the Indemnified Party with respect thereto, unless in the case of a judgment an appeal is made from the judgment.  If the Indemnifying Party desires to appeal from an adverse judgment, then the Indemnifying Party shall post and pay the cost of the security or bond to stay execution of the judgment pending appeal.  Upon the payment in full by the Indemnifying Party of such amounts, the Indemnifying Party shall succeed to the rights of such Indemnified Party, to the extent not waived in settlement, against the third party who made such third party Claim.

10.5     No Waiver.   The closing of the transactions contemplated by this Agreement shall not constitute a waiver by any party of its rights to indemnification hereunder, regardless of whether the party seeking indemnification has knowledge of the breach, violation or failure of condition constituting the basis of the Claim at or before the closing, and regardless of whether such breach, violation or failure is deemed to be "material".

10.6.    Survival of Indemnification.  The indemnification obligations of the parties contained in this **Article 10** shall survive the date of this Agreement and the Closing Date for a period of three (3) years following the Closing Date, except that the indemnification obligations relating to the representations and warranties regarding tax obligations shall survive until one (1) year after the expiration of the applicable statute of limitations for such tax obligations.

11.   CLOSING

11.1     Closing Date.  The closing referred to in this Agreement shall take place on the third business day following the day on which all conditions to Closing have been satisfied or waived, or such other date as is mutually agreed by the parties (the "Closing Date").

11.2     Place of Closing.  The closing shall take place at the offices of the Seller's counsel in New York City or at such other place as the parties hereto shall agree upon.

11.3    Documents to be Delivered by the Seller. On the Closing Date, the Seller shall deliver to Buyer the following documents, in each case duly executed or otherwise in proper form:

11.3(a) Bills of Sale.   Bills of sale and such other instruments of assignment, transfer, conveyance and endorsement as will be sufficient in the opinion of Buyer and its counsel to transfer, assign. convey and deliver to Buyer the Purchased Assets as contemplated hereby.

11.3(b)  Waivers.  A waiver signed by each Lender waiving any claim (and such other documents as Buyer deems necessary to terminate any security interest or encumbrance) to the Purchased Assets or the Restaurant other than the application of the Purchase Price as provided in the Settlement Agreement.

11.3(c) Compliance Certificate. A certificate signed by the manager of the Seller, SFC, Forrest Smith and Kimberly Smith that each of the representations and warranties made by the Seller, SFC, Forrest Smith and Kimberly Smith in this Agreement is true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date (except for any changes permitted by the terms of this Agreement or consented to in writing by Buyer), and that the Seller, SFC, Forrest Smith and Kimberly Smith have performed and complied with all of the Seller's obligations under this Agreement which are to be performed or complied with on or prior to the Closing Date.

11.3(d) Certified Resolutions.  A certified copy of the resolutions of the managers of the Seller authorizing and approving this Agreement and the consummation of the transactions contemplated by this Agreement.

11.3(e) Incumbency Certificate.  Incumbency certificates relating to each person executing any document executed and delivered to Buyer pursuant to the terms hereof.

11.3(f) Other Documents.   All other documents, instruments or writings required to be delivered to Buyer on or prior to the Closing Date pursuant to this Agreement and such other certificates of authority and documents as Buyer may reasonably request.

11.4    Documents to be Delivered by Buyer.  At the Closing, Buyer shall deliver to the Seller the following documents, in each case duly executed or otherwise in proper form:

11.4(a) Purchase Price. A certified or bank cashier's check (or wire transfer) as required by Article 1, to be paid as provided in the Settlement Agreement.

11.4(b) Assumption of Liabilities. Such undertakings and instruments of assumption as will be reasonably sufficient in the opinion of the Seller and its counsel to evidence the assumption of Assumed Liabilities as provided for in Section 3.2.

11.4(c) Compliance Certificate.  A certificate signed by the chief executive officer of Buyer that the representations and warranties made by Buyer in this Agreement are true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date (except for any changes permitted by the terms of this Agreement or consented to in writing by the Seller), and that Buyer has performed and complied with all of Buyer's obligations under this Agreement which are to be performed or complied with on or prior to the Closing Date.

11.4(d) <u>Certified Resolutions</u>.  A certified copy of the resolutions of the Board of Directors of Buyer authorizing and approving this Agreement and the consummation of the transactions contemplated by this Agreement and a certified copy of the resolutions of the Board of Directors of OSI authorizing the execution of the Guarantee of Obligations.

11.4(e) <u>Incumbency Certificate</u>.  Incumbency certificates relating to each person executing any document executed and delivered to the Seller by Buyer or OSI pursuant to the terms hereof.

11.4(f) <u>Other Documents</u>.  All other documents, instruments or writings required to be delivered to the Seller on or prior to the Closing Date pursuant to this Agreement and such other certificates of authority and documents as the Seller may reasonably request.

## 12.  TERMINATION

12.1  <u>Right of Termination Without Breach</u>.

12.1(a) <u>Mutual Agreement</u>. This Agreement may be terminated without further liability of either party at any time prior to the closing by mutual written agreement of Buyer and the Seller.

12.2  <u>Termination for Breach</u>.

12.2(a) <u>Termination by Buyer</u>.  This Agreement may be terminated by Buyer if (i) there has been a material violation or breach by the Seller of any of the agreements, representations or warranties contained in this Agreement which has not been waived in writing by Buyer, or (ii) there has been a failure of satisfaction of a condition to the obligations of Buyer which has not been so waived, or (iii) the Seller shall have attempted to terminate this Agreement under this **Article 12** or otherwise without grounds to do so, then Buyer may, by written notice to the Seller at any time prior to the closing that such violation, breach, failure or wrongful termination attempt is continuing, terminate this Agreement with the effect set forth in **Section 12.2(b)** hereof.

12.2(b) <u>Effect of Termination</u>.  Termination of this Agreement pursuant to this **Section 12.2** shall not in any way terminate, limit or restrict the rights and remedies of any party hereto against any other party which has violated, breached or failed to satisfy any of the representations, warranties, covenants, agreements, conditions or other provisions of this Agreement prior to termination hereof. Subject to the foregoing, the parties' obligations under **Article 12**, **Sections 7.3 - 7.7** and **Section 13.5** of this Agreement shall survive termination.

## 13.  MISCELLANEOUS

13.1  <u>Disclosure Schedules</u>.  The Disclosure Schedules shall not vary, change or alter the language of the representations and warranties contained in this Agreement.

13.2  <u>Further Assurance</u>.  From time to time, upon request and without further consideration, the parties will execute and deliver such documents and take such other action as may be reasonably requested in order to consummate more effectively the transactions contemplated hereby, including, but not limited to, vesting in Buyer good, valid and marketable title to the business and assets being transferred hereunder.

13.3  <u>Disclosures and Announcements</u>.  Both the timing and the content of all disclosure to third parties and public announcements concerning the transactions provided for in this Agreement by the Seller or Buyer shall be subject to the approval of the other in all essential respects, except that Seller approval shall not oe required as to any statements and other information which Buyer may submit to the Securities and Exchange

Commission, NYSE or the stockholders of Buyer or Buyer's Affiliates, or be required to make pursuant to any rule or regulation of the Securities and Exchange Commission or NYSE, or otherwise required by law.

13.4    Assignment; Parties in Interest.

      13.4(a) Assignment. Except as expressly provided herein, the rights and obligations of a party hereunder may not be assigned, transferred or encumbered without the prior written consent of the other parties. Notwithstanding the foregoing, Buyer may, without consent of any other party, cause one or more subsidiaries or Affiliates of Buyer to carry out all or part of the transactions contemplated hereby; provided, however, that Buyer shall, nevertheless, remain liable for all of its obligations, and those of any such subsidiary, to the Seller hereunder.

      13.4(b) Parties in Interest. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the respective successors and permitted assigns of the parties hereto. Nothing contained herein shall be deemed to confer upon any other person any right or remedy under or by reason of this Agreement.

13.5    Law Governing Agreement. This Agreement may not be modified or terminated orally, and shall be construed and interpreted according to the internal laws of the State of Florida, excluding any choice of law rules that may direct the application of the laws of another jurisdiction.

13.6    Amendment and Modification. Buyer and the Seller may amend, modify and supplement this Agreement in such manner as may be agreed upon by them in writing.

13.7    Notice. All notices, requests, demands and other communications hereunder shall be given in writing and shall be: (a) personally delivered; or (b) sent to the parties at their respective addresses indicated herein by registered or certified U.S. mail, return receipt requested and postage prepaid, or by private overnight mail courier service. The respective addresses to be used for all such notices, demands or requests are as follows:

      (a)    If to Buyer, to:

          Outback Steakhouse of Florida, Inc.
          2202 N. West Shore Blvd.
          Suite 500
          Tampa, Florida  33607
          Attention:  Robert Merritt, CFO

          (with a copy to)

          Joseph J. Kadow, Vice President and General Counsel
          Outback Steakhouse, Inc.
          550 N. Reo Street – Suite 200
          Tampa, Florida  33609

or to such other person or address as Buyer shall furnish to the Seller in writing.

(b)     If to the Seller, to:

Smith Foods LLC
c/o Smith Foods Corporation
P.O. Box 31067
Greenwich, CT  06831

With copies to:

Dornbush Mensch Mandelstam & Schaeffer, LLP
747 Third Avenue
New York, New York 10017
Attn: Landey Strongin, Esq.

And

Swidler Berlin Shereff Friedman, LLP
405 Lexington Avenue
New York, NY  10174
Attn: Shalom Jacob, Esq.

or to such other person or address as the Seller shall furnish to Buyer in writing.

If personally delivered, such communication shall be deemed delivered upon actual receipt; if sent by overnight courier pursuant to this paragraph, such communication shall be deemed delivered upon receipt; and if sent by U.S. mail pursuant to this paragraph, such communication shall be deemed delivered as of the date of delivery indicated on the receipt issued by the relevant postal service, or, if the addressee fails or refuses to accept delivery, as of the date of such failure or refusal. Any party to this Agreement may change its address for the purposes of this Agreement by giving notice thereof in accordance with this Section. Notices sent by facsimile or other electronic means shall not constitute notice under this Agreement.

13.8    Expenses.   Regardless of whether or not the transactions contemplated hereby are consummated:

13.8(a) Brokerage. The Seller and Buyer each represent and warrant to each other that there is no broker involved or in any way connected with the transfer provided for herein. Buyer agrees to hold the Seller harmless from and against all claims for brokerage commissions or finder's fees incurred through any act of Buyer in connection with the execution of this Agreement or the transactions provided for herein. The Seller agrees to hold Buyer harmless from and against all claims for brokerage commissions or finder's fees incurred through any act of the Seller in connection with the execution of this Agreement or the transactions provided for herein.

13.8(b) Other. Except as otherwise provided herein, each of the parties shall bear its own expenses and the expenses of its counsel, accountants, and other agents in connection with the transactions contemplated hereby.

13.8(c) Costs of Litigation. The parties agree that the prevailing party in any action brought with respect to or to enforce any right or remedy under this Agreement shall be entitled to recover from the other party or parties all reasonable costs and expenses of any nature whatsoever incurred by the prevailing party in connection with such action, including without limitation reasonable attorneys' fees and prejudgment interest.

13.9    Entire Agreement.  This instrument and the agreements referred to herein embody the entire agreement between the parties hereto with respect to the transactions contemplated herein, and there have been and are no agreements, representations or warranties between the parties other than those set forth or provided for herein.

13.10    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.11    Headings.  The headings in this Agreement are inserted for convenience only and shall not constitute a part hereof.

13.12    Affiliate.  For purposes of this Agreement, the term "Affiliate" shall mean any individual or entity (hereafter a "Person"), directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person, as applicable.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

ATTEST:

_____
Joseph J. Kadow, Secretary

"BUYER"

OUTBACK STEAKHOUSE OF FLORIDA, INC., a Florida corporation

By: _____
~~Paul Avery, President~~
Robert S. Merritt Senior Vice President

"SELLER"

SMITH FOODS LLC,
a New York limited liability company

By: SMITH FOODS CORP., Manager

By: _____
Forrest Smith, President

SMITH FOODS CORP., a Connecticut corporation

By: _____
Forrest Smith, President

FORREST SMITH

_____
Forrest Smith, individually

KIMBERLY SMITH

_____
Kimberly Smith, individually

## SCHEDULE _2.1(a.)_

### LEASED REAL PROPERTY

One Leased Property at
23-46/48 Bell Boulevard

Location:    23-46/48 Bell Boulevard, Bayside, NY (in the Bayside shopping Center at Bell Blvd. and 26th Street)

Date:    July 1999

Landlord:    Cord Meyer Development, LLC

Tenant:    Smith Foods LLC, an Outback Steakhouse Franchisee

## SCHEDULE _2.1(d.)_

## <u>CONTRACTS</u>

Franchise Agreement with Outback Steakhouse of Florida, Inc. Dated July 26, 1999

Paul Noel Verbal Employment Contract with Smith Foods, LLC Dated December 26, 2002

Frank Gargiulo & Son, Inc. – Produce Price Contract

PFG Customized Distribution – Outback National Pricing Contract

Excel Specialty Products – Outback National Pricing Contract

Ameri Pride – August 1, 2002 to July 31, 2003

Hobart Corporation – December 16, 2002 to December 15, 2003

## SCHEDULE _4.3_

## GOVERNMENT CONSENTS AND APPROVALS

Schedule 4.11(b) is incorporated by reference.

Schedule 4.12(a) is incorporated by reference.

**SCHEDULE __4.4__**

**FINANCIAL STATEMENTS**

SEE ATTACHED

**Smith Foods Corporation**
**For the Twelve Months Ending December 31, 2002**

BALANCE SHEET

ASSETS

| | |
|---|---:|
| Total Cash | 26,273.91 |
| Accounts Receivable | 20,093.90 |
| | ------------------------ |
| Total Accounts Receivable | 20,093.90 |
| | |
| | ------------------------ |
| CURRENT ASSETS | 46,367.81 |
| Automobiles | 45,000.00 |
| Investment Franchise Units Outback Steakhouse | 3,314,305.92 |
| | ------------------------ |
| Net  Fixed Assets | 3,359,305.92 |
| TOTAL ASSETS | $3,405,673.73 |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | |
|---|---:|
| Accounts Payable | $240,517.49 |
| Note Payable Chase Bank | 22,019.15 |
| Accrued Liabilities | 6,311.27 |
| | ------------------------ |
| Total Current Liabilities | 268,847.91 |
| Note Payable - OSI | 460,000.00 |
| Note Payable  - Pegasus | 2,000,000.00 |
| Note Payable - Dorothy Parks | 250,000.00 |
| Note Payable - Fred Price | 1,500,000.00 |
| | ------------------------ |
| Long-Term Liabilities | 4,210,000.00 |
| | ------------------------ |
| TOTAL LIABILITIES | 4,478,847.91 |
| Retained Earnings | (1,073,174.18) [1] |
| | ------------------------ |
| SHAREHOLDERS' EQUITY | (1,073,174.18) |
| LIABILITIES AND SHAREHOLDERS' EQUITY | $3,405,673.73 |

1 Retained Earnings represents a loss for the year 2002, prior years' assumed to be breakeven

Smith Foods - New York City Outback Steakhouse Franchise
For the Period Ending December 31, 2002

BALANCE SHEET

| | BAYSIDE | BROOKLYN | QUEENS PLACE | 919 THIRD AVE. | 700 6TH AVE. | CONSOLIDATED |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Total Cash | 49,466.77 | 127,837.91 | 123,657.98 | 246,725.24 | 6,886.20 | 554,574.10 |
| Credit Card Receivable | 50,584.93 | 49,397.10 | 38,066.13 | 65,220.89 | | 203,269.05 |
| Accounts Receivable | (212.32) | (757.43) | 5,311.06 | 22,747.96 | | 27,089.27 |
| Accounts Receivable OSI Gift Certificate | 2,960.00 | 2,285.00 | 460.13 | 1,674.00 | | 7,379.13 |
| Interco Accounts Receivable | - | - | - | | | - |
| Total Accounts Receivable | 53,332.61 | 50,924.67 | 43,837.32 | 89,642.85 | | 237,737.45 |
| Total Inventory | 35,082.98 | 28,833.31 | 28,044.70 | 41,906.00 | | 133,866.99 |
| Total Prepaid Expenses | (5,743.97) | 157,138.38 | 76,993.85 | 28,464.10 | 247,722.71 | 504,575.07 |
| CURRENT ASSETS | 132,138.39 | 364,734.27 | 272,533.85 | 406,738.19 | 254,608.91 | 1,430,753.61 |
| Preopening Expenses | 413,739.28 | 691,978.64 | 490,223.44 | 616,258.46 | 184,699.10 | 2,396,898.92 |
| Leasehold Improvements | 2,147,042.47 | 1,980,611.63 | 2,203,804.95 | 2,977,160.53 | 2,694,069.50 | 12,002,689.08 |
| Furniture, Fixtures & Equipment | 600,253.69 | 542,916.98 | 614,209.49 | 752,001.72 | 404,776.65 | 2,914,158.53 |
| Accum Depreciation | (264,708.00) | (269,701.45) | (204,194.00) | (109,780.00) | | (848,383.45) |
| Net Fixed Assets | 2,896,327.44 | 2,945,805.80 | 3,104,043.88 | 4,235,640.71 | 3,283,545.25 | 16,465,363.08 |
| TOTAL ASSETS | $ 3,028,465.83 | $ 3,310,540.07 | $ 3,376,577.73 | $ 4,642,378.90 | $ 3,538,154.16 | $ 17,896,116.69 |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Accounts Payable | 152,585.57 | 198,361.92 | 329,141.08 | 365,200.31 | 349,054.27 | 1,394,343.15 |
| Gift Certificate Liability | 64,204.00 | 67,274.00 | 53,062.00 | 18,823.10 | | 203,363.10 |
| Taxes Payable | 525,973.86 | 678,478.42 | 438,747.86 | 198,871.18 | | 1,842,071.32 |
| Accrued Liabilities | 73,208.51 | 64,250.24 | 83,390.18 | 93,620.36 | | 314,469.29 |
| Total Current Liabilities | 815,971.94 | 1,008,364.58 | 904,341.12 | 676,514.95 | 349,054.27 | 3,754,246.86 |
| Notes Payable - Long Term | 835,442.43 | 1,992,700.93 | 2,477,841.16 | 2,864,331.57 | 2,435,784.18 | 10,606,100.27 |
| Long-Term Liabilities | 835,442.43 | 1,992,700.93 | 2,477,841.16 | 2,864,331.57 | 2,435,784.18 | 10,606,100.27 |
| TOTAL LIABILITIES | 1,651,414.37 | 3,001,065.51 | 3,382,182.28 | 3,540,846.52 | 2,784,838.45 | 14,360,347.13 |
| Franchisee Capital | 715,954.36 | (291,180.08) | 35,988.59 | 1,609,890.92 | 753,315.71 | 2,823,969.50 |
| Year-to-Date Income | 151,814.63 | 575,507.54 | (29,249.18) | (508,358.54) | | 189,714.45 |
| Retained Earnings | 509,282.47 | 25,147.10 | (12,343.96) | | | 522,085.61 |
| SHAREHOLDERS' EQUITY | 1,377,051.46 | 309,474.56 | (5,604.55) | 1,101,532.38 | 753,315.71 | 3,535,769.56 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | $3,028,465.83 | $3,310,540.07 | $3,376,577.73 | $4,642,378.90 | $3,538,154.16 | $17,896,116.69 |

**CONSOLIDATED**
**For the Twelve Months Ending December 31, 2002**

| | Bayside | | Brooklyn | | Queens | | 919 Third Ave. | | CONSOLIDATED | |
|---|---|---|---|---|---|---|---|---|---|---|
| **FOOD SALES** | | | | | | | | | | |
| Sales - Food | 3,556,332.90 | 83.55% | 4,407,019.16 | 82.65% | 3,602,898.82 | 82.74% | 2,057,090.96 | 80.98% | 13,623,341.84 | 82.65% |
| Sales - Beverages | 242,915.46 | 5.71% | 287,765.43 | 5.40% | 279,072.40 | 6.41% | 121,003.21 | 4.76% | 930,756.50 | 5.65% |
| **TOTAL FOOD SALES** | $3,799,248.36 | 89.26% | $4,694,784.59 | 88.05% | $3,881,971.22 | 89.15% | $2,178,094.17 | 85.74% | $14,554,098.34 | 88.30% |
| Sales - Liquor | 185,789.42 | 4.36% | 288,387.50 | 5.41% | 237,745.62 | 5.46% | 146,028.72 | 5.75% | 857,951.26 | 5.21% |
| Sales - Beer | 195,247.01 | 4.59% | 267,344.59 | 5.01% | 179,008.11 | 4.11% | 135,470.45 | 5.33% | 777,070.16 | 4.71% |
| Sales - Wine | 76,170.41 | 1.79% | 81,442.56 | 1.53% | 55,708.15 | 1.28% | 80,690.70 | 3.18% | 294,011.82 | 1.78% |
| **TOTAL LIQUOR SALES** | $457,206.84 | 10.74% | $637,174.65 | 11.95% | $472,461.88 | 10.85% | $362,189.87 | 14.26% | $1,929,033.24 | 11.70% |
| **TOTAL INCOME** | $4,256,455.20 | 100.00% | $5,331,959.24 | 100.00% | $4,354,433.10 | 100.00% | $2,540,284.04 | 100.00% | $16,483,131.58 | 100.00% |
| **COST OF GOODS SOLD** | | | | | | | | | | |
| CGS - Meat | 746,873.71 | 19.66% | 948,362.70 | 20.20% | 753,114.57 | 19.40% | 405,042.04 | 18.60% | 2,853,393.02 | 19.61% |
| CGS - Fish | 33,875.66 | 0.89% | 28,093.68 | 0.60% | 31,325.93 | 0.81% | 32,059.33 | 1.47% | 125,354.60 | 0.86% |
| CGS - Shrimp | 71,059.72 | 1.87% | 90,827.89 | 1.93% | 74,392.58 | 1.92% | 34,900.00 | 1.60% | 271,180.19 | 1.86% |
| CGS - Produce | 162,148.03 | 4.27% | 188,165.01 | 4.01% | 148,057.53 | 3.81% | 107,450.43 | 4.93% | 605,821.00 | 4.16% |
| CGS - Dairy | 110,921.03 | 2.92% | 127,261.80 | 2.71% | 117,847.19 | 3.04% | 64,257.37 | 2.95% | 420,287.39 | 2.89% |
| CGS - Food Other | 127,285.86 | 3.35% | 155,197.80 | 3.31% | 138,357.18 | 3.56% | 88,522.39 | 4.06% | 509,363.23 | 3.50% |
| CGS - Beverages | 33,936.31 | 0.89% | 39,256.60 | 0.84% | 38,353.54 | 0.99% | 22,372.81 | 1.03% | 133,919.26 | 0.92% |
| CGS - Lobster | 60,608.29 | 1.60% | 60,234.27 | 1.28% | 55,467.97 | 1.43% | 30,020.49 | 1.38% | 206,331.02 | 1.42% |
| **TOTAL FOOD COST** | $1,346,708.61 | 35.45% | $1,637,399.75 | 34.88% | $1,356,916.49 | 34.95% | $784,624.86 | 36.02% | $5,125,649.71 | 35.22% |
| **LIQUOR COST** | | | | | | | | | | |
| CGS - Liquor | 37,900.24 | 20.40% | 49,997.24 | 17.34% | 40,428.85 | 17.01% | 28,429.54 | 19.47% | 155,755.87 | 18.27% |
| CGS - Beer | 37,793.14 | 19.36% | 54,818.38 | 20.50% | 38,648.22 | 21.59% | 28,603.61 | 21.11% | 159,863.35 | 20.57% |
| CGS - Wine | 24,881.05 | 32.66% | 24,981.58 | 30.67% | 21,362.25 | 38.35% | 26,904.89 | 33.34% | 98,129.77 | 33.38% |
| **LIQUOR COST** | 100,574.43 | 22.00% | 129,797.20 | 20.37% | 100,439.32 | 21.26% | 83,938.04 | 23.18% | 414,748.99 | 21.50% |
| **TOTAL COST OF GOODS SOLD** | $1,447,283.04 | 34.09% | $1,767,196.95 | 33.14% | $1,457,355.81 | 33.47% | $868,562.90 | 34.19% | $5,540,398.70 | 33.61% |

EXPENSES

LABOR, TAXES & BENEFITS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Service Labor | 270,126.42 | 6.35% | 299,234.99 | 5.61% | 308,031.46 | 7.07% | 237,396.36 | 9.35% | 1,114,789.23 | 6.76% |
| Kitchen Labor | 427,269.62 | 10.04% | 462,893.39 | 8.68% | 458,163.29 | 10.52% | 326,948.54 | 12.87% | 1,675,274.84 | 10.16% |
| Management Labor | 127,951.40 | 3.01% | 129,118.40 | 2.42% | 115,185.11 | 2.65% | 104,839.45 | 4.13% | 477,094.36 | 2.89% |
| Bonus | 47,478.83 | 1.12% | 62,178.06 | 1.17% | 51,667.00 | 1.19% | 70,524.67 | 2.78% | 231,848.56 | 1.41% |
| Vacation Labor | 8,109.78 | 0.19% | 2,295.88 | 0.04% | 1,044.12 | 0.02% | 0.00 | 0.00% | 11,449.78 | 0.07% |
| Payroll Taxes | 113,052.90 | 2.66% | 131,963.17 | 2.47% | 118,252.80 | 2.72% | 82,660.89 | 3.25% | 445,929.76 | 2.71% |
| Workmen's Compensation | 17,832.00 | 0.42% | 17,832.00 | 0.33% | 17,832.00 | 0.41% | 10,897.30 | 0.43% | 64,393.30 | 0.39% |
| SUTA Tax Expense | 18,542.28 | 0.44% | 26,789.82 | 0.50% | 32,261.68 | 0.74% | 30,046.47 | 1.18% | 107,640.23 | 0.65% |
| FUTA Tax Expense | 4,442.50 | 0.10% | 4,305.36 | 0.08% | 5,295.25 | 0.12% | 5,436.89 | 0.21% | 19,480.00 | 0.12% |
| Disability Insurance | 7,100.00 | 0.17% | 7,208.90 | 0.14% | 7,154.45 | 0.16% | 4,400.00 | 0.17% | 25,863.35 | 0.16% |
| Health Insurance | 15,605.83 | 0.37% | 18,311.03 | 0.34% | 20,942.06 | 0.48% | 12,142.65 | 0.48% | 67,001.57 | 0.41% |
| Employee Benefits | 23,180.12 | 0.54% | 17,579.67 | 0.33% | 16,782.32 | 0.39% | 7,928.40 | 0.31% | 65,470.51 | 0.40% |
| Comp 4: 50% | 34,910.14 | 0.82% | 41,129.91 | 0.77% | 49,863.14 | 1.15% | 27,559.26 | 1.08% | 153,462.45 | 0.93% |
| Comp 8: Mgr | 4,039.64 | 0.09% | 3,457.47 | 0.06% | 3,765.07 | 0.09% | 2,056.00 | 0.08% | 13,318.18 | 0.08% |
| Comp 7: Full | 12.98 | 0.00% | 8,437.48 | 0.16% | 3,765.58 | 0.09% | 2,792.09 | 0.11% | 15,008.13 | 0.09% |
| Comp 12:Other Units | 0.00 | 0.00% | 256.72 | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | 256.72 | 0.00% |
| TOTAL LABOR, TAX, BENEFITS | 1,119,654.42 | 26.30% | 1,232,992.25 | 23.12% | 1,210,005.33 | 27.79% | 925,628.97 | 36.44% | 4,488,280.97 | 27.23% |

## CONTROLLABLE EXPENSES

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Public Relations | 6,112.51 | 0.14% | 0.00 | 0.00% | 888.29 | 0.02% | 546.39 | 0.02% | 7,547.19 | 0.05% |
| PR Comp 2:Food | 34,133.46 | 0.80% | 33,624.05 | 0.63% | 44,655.40 | 1.03% | 22,476.02 | 0.85% | 134,888.94 | 0.82% |
| PR Comp 11: Liquor | 2,277.79 | 0.05% | 15,410.67 | 0.29% | 1,441.87 | 0.03% | 3,115.27 | 0.12% | 22,245.60 | 0.13% |
| Operating Supplies | 112,435.67 | 2.64% | 126,522.93 | 2.37% | 109,707.88 | 2.52% | 73,373.79 | 2.89% | 422,040.27 | 2.56% |
| Repairs & Maintenance Expense | 84,846.17 | 1.99% | 93,497.21 | 1.75% | 64,439.00 | 1.48% | 40,833.63 | 1.61% | 283,616.01 | 1.72% |
| Recruiting | 324.16 | 0.01% | 107.50 | 0.00% | 0.00 | 0.00% | 107.50 | 0.00% | 539.16 | 0.00% |
| Linen & Laundry | 33,767.57 | 0.79% | 45,235.07 | 0.85% | 39,266.56 | 0.90% | 24,012.81 | 0.95% | 142,282.01 | 0.86% |
| Equipment Rental | 0.00 | 0.00% | 0.00 | 0.00% | (170.00) | 0.00% | 0.00 | 0.00% | (170.00) | 0.00% |
| Menus And Lists | 492.08 | 0.01% | 1,635.56 | 0.03% | 1,294.26 | 0.03% | 761.20 | 0.03% | 4,183.10 | 0.03% |
| Other Direct Operating | 47,507.33 | 1.12% | 29,376.19 | 0.55% | 24,198.12 | 0.56% | 11,571.14 | 0.46% | 112,652.78 | 0.68% |
| Postage | 1,852.85 | 0.04% | 2,288.44 | 0.04% | 3,387.79 | 0.08% | 2,003.07 | 0.08% | 9,532.15 | 0.06% |
| Freight | 1,156.65 | 0.03% | 27.47 | 0.00% | 637.67 | 0.01% | 159.13 | 0.01% | 1,980.92 | 0.01% |
| Bank Fees | 0.00 | 0.00% | 30.00 | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | 30.00 | 0.00% |
| Dues And Subscriptions | 32.00 | 0.00% | (60.40) | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | (28.40) | 0.00% |
| Travel & Entertainment | 1,677.42 | 0.04% | 1,943.46 | 0.04% | 7,957.18 | 0.18% | 5,254.27 | 0.21% | 16,832.33 | 0.10% |
| Entertainment | (1,645.43) | -0.04% | 0.00 | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | (1,645.43) | -0.01% |
| Permits & Licenses | 1,528.59 | 0.04% | 2,536.86 | 0.05% | 1,326.40 | 0.03% | 0.00 | 0.00% | 5,391.85 | 0.03% |
| Cash Over/Short | 1,298.70 | 0.03% | 97.62 | 0.00% | (126.93) | 0.00% | 943.38 | 0.04% | 2,212.77 | 0.01% |
| Uniforms | 4,587.94 | 0.11% | 1,978.01 | 0.04% | 7,898.84 | 0.18% | 4,678.81 | 0.18% | 19,143.60 | 0.12% |
| Petty Cash Reimbursements | | | | | | | | | | |
| Credit Card Discount | 47,454.17 | 1.11% | 49,137.43 | 0.92% | 45,410.95 | 1.04% | 38,580.96 | 1.52% | 180,583.51 | 1.10% |
| Utilities | 166,175.87 | 3.90% | 158,440.07 | 2.97% | 132,326.25 | 3.04% | 124,428.20 | 4.90% | 581,370.39 | 3.53% |
| Merchandise Purchase | 406.66 | 0.01% | 0.00 | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | 406.66 | 0.00% |
| Sundries Merchandise | (676.70) | -0.02% | (12.50) | 0.00% | (370.00) | -0.01% | (278.10) | -0.01% | (1,337.30) | -0.01% |
| TOTAL OPERATING EXPENSE | $545,745.46 | 12.82% | $561,815.65 | 10.54% | $484,169.53 | 11.12% | $352,567.47 | 13.88% | $1,944,298.11 | 11.80% |
| TOTAL CONTROLLABLE INCOME | $1,143,772.28 | 26.87% | $1,769,954.39 | 33.20% | $1,202,902.43 | 27.62% | $393,524.70 | 15.49% | $4,510,153.80 | 27.36% |

## OTHER OPERATING EXPENSE

| | | | | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Advertising | 152,090.78 | 3.57% | 195,629.55 | 3.67% | 157,738.11 | 3.62% | 77,351.49 | 3.04% | 582,809.93 | 3.54% |
| Comp 1-Advertising | 6,018.21 | 0.14% | 2,501.86 | 0.05% | 4,022.65 | 0.09% | 21,404.96 | 0.84% | 33,947.68 | 0.21% |
| CAM Rent | 39,431.08 | 0.93% | 0.00 | 0.00% | 33,915.89 | 0.78% | 0.00 | 0.00% | 73,346.97 | 0.44% |
| Excess Rent | 0.00 | 0.00% | 0.00 | 0.00% | 12,413.43 | 0.29% | 0.00 | 0.00% | 12,413.43 | 0.08% |
| Rent Expense | 237,829.82 | 5.59% | 292,499.30 | 5.49% | 341,700.00 | 7.85% | 299,444.41 | 11.79% | 1,171,473.53 | 7.11% |
| Preopening Overage Amortization | 0.00 | 0.00% | 0.00 | 0.00% | 0.00 | 0.00% | 10,667.00 | 0.42% | 10,667.00 | 0.06% |
| Insurance | 21,208.95 | 0.50% | 19,006.86 | 0.36% | 18,860.42 | 0.43% | 10,355.13 | 0.41% | 69,431.36 | 0.42% |
| Miscellaneous | (0.12) | 0.00% | 0.00 | 0.00% | (58.95) | 0.00% | 0.00 | 0.00% | (59.07) | 0.00% |
| Property Taxes | 16,144.68 | 0.38% | 15,000.00 | 0.28% | 25,267.24 | 0.58% | 9,150.00 | 0.36% | 65,561.92 | 0.40% |
| Interest Expense | 23,040.00 | 0.54% | 23,040.00 | 0.43% | 23,040.00 | 0.53% | 14,080.00 | 0.55% | 83,200.00 | 0.74% |
| Royalty Expense | 128,118.22 | 3.01% | 155,800.60 | 2.92% | 127,034.52 | 2.92% | 74,380.27 | 2.93% | 485,333.61 | 2.92% |
| Accounting Fees | 42,564.53 | 1.00% | 53,319.59 | 1.00% | 43,544.33 | 1.00% | 25,402.83 | 1.00% | 164,831.28 | 1.00% |
| Supervision Fees | 32,972.97 | 0.77% | 41,837.26 | 0.78% | 34,038.58 | 0.78% | 15,936.65 | 0.63% | 124,785.46 | 0.76% |
| Legal & Professional | 42,564.54 | 1.00% | 53,319.58 | 1.00% | 43,544.32 | 1.00% | 25,402.84 | 1.00% | 164,831.28 | 1.00% |
| TOTAL OTHER EXPENSE | $741,983.66 | 17.43% | $851,954.60 | 15.98% | $865,060.74 | 19.87% | $693,355.58 | 27.29% | 3,152,354.58 | 0.74% |
| TOTAL EXPENSES | $2,407,383.54 | 56.56% | $2,646,762.50 | 49.64% | $2,559,235.60 | 58.77% | $1,971,552.02 | 77.61% | 9,584,933.66 | 0.74% |
| NET INCOME BEFORE TAXES AND DEPRECIATION | $401,788.62 | 9.44% | $917,999.79 | 17.22% | $337,841.69 | 7.76% | ($299,830.88) | -11.80% | 1,357,799.22 | 0.74% |
| Managing Partner Distribution | 35,636.86 | | 87,257.98 | | 29,692.17 | | | | 152,587.01 | |
| JVP Distribution | 32,073.18 | | 78,532.18 | | 26,722.95 | | | | 137,328.31 | |

## SCHEDULE __4.5__

## <u>TAX MATTERS</u>

SALES TAX –         December 2001 to November 2002 – Filed but not paid
                    December 2002 – Filed and paid

INCOME TAX -        2000 – Not filed
                    2001 – Not filed
                    2002 – Not filed

**SCHEDULE __4.8__**

**<u>CERTAIN CHANGES SINCE DECEMBER 1, 2002</u>**

The Seller is insolvent and continues to be unable to meet its obligations as they become due.

## SCHEDULE __4.9__

## UNDISCLOSED LIABILITIES

NONE

## SCHEDULE __4.10__

## <u>LITIGATION</u>

     Tenant has not paid January, February or March rent.  Landlord has agreed to forbear commencing summary proceedings to evict Tenant, provided Landlord is paid for all rent which is past due and properly payable at or prior to the Closing of the transactions contemplated by this Agreement.  In the even the Closing does not occur by March 31, the Landlord has retained its right to bring suit.

SCHEDULE __4.11(a.)__

## NOTICE OF VIOLATION OR
## ALLEGED VIOLATION OF LAWS OR ORDERS

NONE

## SCHEDULE __4.11(b.)__

## LICENSES, PERMITS AND APPROVALS

Liquor license and other customary licenses for restaurants operated in New York

## SCHEDULE __4.12(a.)__

## RESTRICTIONS ON TRANSFERABILITY OF ASSETS

Consent from the Landlord to the assignment of the Lease set forth on Schedule 2.1(a.) is not required, provided that the Seller is in default under the Franchise Agreement or the Franchise Agreement is terminated and the Buyer provides notice to the Landlord that it is exercising its option to assume the Lease and, provided further that Buyer cures any existing Tenant defaults under the Lease.

Liens pursuant to the terms of the Loan Agreements which shall be released as of the Closing Date.

## SCHEDULE __4.13__

## <u>INSURANCE</u>

| | |
|---|---|
| Package Policy: | Public Service Mutual #0074332849, Effective 8/24/02 to 8/24/03 |
| Work Comp: | First Cardinal Corp #C1039-05, Effective 1/1/03 to 1/1/04 |
| Umbrella: | Public Service Mutual #UM 005437, Effective 8/24/02 to 8/24/03 |
| EPLI: | Lexington, Effective 8/24/02 to 8/24/03 |
| DBL: | First Rehabilitation Life, Effective 10/28/00 – 10/28/05 |
| Employee Practices Liability: | Lexington, #4370914, Effective 8/24/02 to 8/24/03 |
| Disability: | First Rehabilitation Life, Effective 10/28/00 – 10/28/05 |

\* The Package Policy includes the following coverages in the following amounts:  liquor liability ($2,000,000), general liability ($2,000,000 aggregate, $1,000,000 per occurrence), Business Personal Property ($440,000), Betterments and Improvements ($350,000), and Business Interruption.

SCHEDULE __4.14(c.)__

## LOAN AGREEMENTS

Loan in the amount of $900,000 by General Electric Capital Business Asset Funding Corporation pursuant to a Term Note dated October 21, 1999 and a Mater Loan Agreement dated September 10, 1999.

Loan in the amount of $460,000 from Outback Steakhouse of Florida, Inc. pursuant to the Loan Agreement dated as of April 1, 2002.

Excludes intercompany indebtedness not shown on consolidated Financial Statements attached at Schedule 4.4.

## SCHEDULE __4.14(f.)__

### GUARANTEES

The loans extended by the Lenders as defined in the Settlement Agreement dated as of February 7, 2003 are cross-collateralized and in some instances cross-guaranteed by the Seller and the other operating Subsidiaries of Smith Foods Corp.

## SCHEDULE __4.14(h.)__

## OTHER MATERIAL CONTRACTS

NONE

Smith Foods, LLC
Schedules to Asset Purchase Agreement
Doc. #151043 v.2

**SCHEDULE __4.16__**

**<u>EMPLOYEE BENEFIT PLANS</u>**

Hourly Medical:          H.I.P. #1LEADER 428, Effective 5/1/02 to 4/30/03

Management Medical:     Guardian #00674284, Effective 8/1/02 to 7/31/03